WO                                                                                                      SC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Jarvis Atwood, | No.   CV 20-00623-PHX-JAT (JZB) |
| Plaintiff, | |
| v. | **ORDER** |
| Panaan Days, et al., | |
| Defendants. | |

Plaintiff Frank Jarvis Atwood, who is confined in the Arizona State Prison Complex-Eyman, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983 (Doc. 1), a motion for injunctive relief (Doc. 3),[1] and a memorandum of law in support (Doc. 4), and paid the filing and administrative fees (Doc. 9).  The Court ordered Defendants Days, Arnold, and Shinn to answer the Complaint and ordered Defendant Days and Shinn to respond to a portion of Plaintiff's motion for a preliminary injunction.  (Doc. 10.)  On July 10, 2020, Defendants Arnold, Days, and Shinn filed their Answer to the Complaint (Doc. 20).

On July 21, 2020, Plaintiff filed "Plaintiff's Notice of Filing an Amended Complaint (as Matter of Course) and Motion to Supplement the Complaint" (Doc. 22) and lodged a proposed First Amended Complaint (Doc. 23).  On July 24, 2020, Defendants filed a response to Plaintiff's motion for injunctive relief (Doc. 26).  On July 29, 2020, Plaintiff

---

[1] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

TERMPSREF

1   filed a "Supplement" to his motion for injunctive relief (Doc. 27) and an "Amended Brief"
2   in support of his motion for injunctive relief (Doc. 28).  On August 4, 2020, Defendants
3   opposed Plaintiff's filing of his motion to supplement his Complaint for failure to provide
4   a red-lined version of the First Amended Complaint (Doc. 29).  On August 5, 2020,
5   Plaintiff filed his Reply (Doc. 30) to Defendants' Response to his motion for injunctive
6   relief.  On August 13, 2020, Plaintiff filed his reply to Defendant's Response to his motion
7   to supplement the Complaint (Doc. 31).

8        The Court will direct that Plaintiff's First Amended Complaint be filed as of the
9   date lodged and will deny Plaintiff's motion to supplement his Complaint (Doc. 22) as
10  moot.  The Court will order Defendants Centurion, Olmstead, Lopez, Days, Arnold, Shinn,
11  and Scott to answer Counts I and IV of the First Amended Complaint, as set forth herein,
12  and will dismiss the remaining claims and Defendants without prejudice.  The Court will
13  deny the motion for injunctive relief in part and order Defendants to file a sur-reply as to
14  two discrete issues.

15  **I.    "Motion to Supplement" the Complaint**

16       Plaintiff submitted a motion to, purportedly, supplement the Complaint.  Defendants
17  oppose the motion because Plaintiff failed to submit a red-lined copy of his First Amended
18  Complaint.[2]  Plaintiff submitted a description of changes from the Complaint to the First
19  Amended Complaint.

20       Plaintiff purports to seek to supplement the Complaint.  Rule 15(d) of the Federal
21  Rules of Civil Procedure provides that "[o]n motion and reasonable notice, the court may,
22  on just terms, permit a party to serve a supplemental pleading setting out any transaction,
23  occurrence, or event that happened after the date of the pleading to be supplemented."
24  Plaintiff did not merely set out a transaction, occurrence, or event that happened after the
25  date of the pleading to be supplemented.  Plaintiff submitted an amended complaint that
26  deleted, portions of the Complaint, added or rephrased allegations in the Complaint, and

27
28
TERMPSREF

---

[2]  Defendants do not claim that Plaintiff's failure to submit a red-lined copy of his First Amended Complaint has affected their ability to respond to his claims.

1 added Defendants and claims.

2       The Court, in its discretion, will direct that the First Amended Complaint be filed as

3 of the date that it was lodged.  *Prof'l Programs Grp. v. Dep't of Commerce*, 29 F.3d 1349,

4 1353 (9th Cir. 1994) (although local rules have the force of law, district courts have broad

5 discretion to depart from them "where it makes sense to do so and substantial rights are not

6 at stake") (citing *Martel v. County of Los Angeles*, 21 F.3d 940, 946-47 (9th Cir.1994).

7 Plaintiff's motion to supplement the Complaint (Doc. 22) will be denied as moot.

8 **II.     Statutory Screening of Prisoner Complaints**

9       The Court is required to screen complaints brought by prisoners seeking relief

10 against a governmental entity or an officer or an employee of a governmental entity.  28

11 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff

12 has raised claims that are legally frivolous or malicious, that fail to state a claim upon which

13 relief may be granted, or that seek monetary relief from a defendant who is immune from

14 such relief.  28 U.S.C. § 1915A(b)(1)-(2).

15       A pleading must contain a "short and plain statement of the claim *showing* that the

16 pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does

17 not demand detailed factual allegations, "it demands more than an unadorned, the-

18 defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

19 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere

20 conclusory statements, do not suffice."  *Id.*

21       "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a

22 claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*,

23 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content

24 that allows the court to draw the reasonable inference that the defendant is liable for the

25 misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for

26 relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial

27 experience and common sense."  *Id.* at 679.  Thus, although a plaintiff's specific factual

28 allegations may be consistent with a constitutional claim, a court must assess whether there

TERMPSREF

are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## III.   First Amended Complaint

In his four-count First Amended Complaint, Plaintiff alleges claims for unconstitutional denial of medical care, denial of access to the court, retaliation, and violation of his religious exercise rights. Plaintiff sues Centurion, a private corporation that contracted with the Arizona Department of Corrections (ADC) to provide health care for ADC inmates. In addition, Plaintiff sues Health Care Provider (HCP) Pamela Olmstead, a Centurion employee who works or worked at ADC's Eyman Complex. Plaintiff also sues ADC Director David Shinn; Deputy Warden Scott; former Deputy Warden Panann Days; Associate Deputy Warden Orin Romney; and Sergeants Lopez, Wallis, and Violetray Arnold.[3]  Plaintiff seeks injunctive relief.

---

[3] Plaintiff sues the individual Defendants in their individual and official capacities. A § 1983 suit against a defendant in his or her *individual* capacity seeks to impose personal liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). For a person to be liable in his or her individual capacity, "[a] plaintiff must allege facts, not simply conclusions, that show that the individual was personally involved in the deprivation of his civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). By comparison, a suit against a defendant in his or her *official* capacity represents only another way of pleading an action against the entity that employs the defendant. *Kentucky*, 473 U.S. at 165. That is, the real party in interest is not the named defendant, but the entity that employs the defendant. *Id.* To bring a claim against an individual in his official capacity, a plaintiff must show that the constitutional deprivation resulted from the entity's policy, custom, or practice. *Id.*; *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978).

Although Plaintiff has named the defendants in both their individual and official capacities, Plaintiff's allegations fail to plausibly show that any policy, practice, or custom of any entity has resulted in his alleged injuries. Accordingly, the Court will construe Plaintiff's claims as directed against the Defendants in their *individual* capacities only and evaluate them accordingly.

### A.    Count I

Plaintiff designates Count I as a claim for denial of constitutionally adequate medical care based on the following facts:

Plaintiff was diagnosed with progressive spinal disease in 1990; Plaintiff has used a brace and a transcutaneous electric nerve stimulator (TENS),[4] in maximum and close custody, since 1991, and has been prescribed medications for pain.  In 2008 and 2010, CT scans revealed severe spinal damage, degenerative joint and disc disease, stenosis, scoliosis, and hypertrophic changes.  Since 2011, Plaintiff has been treated with medication and therapy for anxiety, post-traumatic stress disorder, and depression.  (Doc. 23 at 6 ¶ 29.)  Since 2015, Plaintiff has been classified as an Americans with Disabilities Act (ADA) patient and has been "wheelchaired."  (*Id.* at 4 ¶ 4.)  In 2017, an MRI reflected advanced stenosis, for which cervical fusion was recommended.  On December 11, 2018, Plaintiff received cervical fusion surgery.  (*Id.* ¶ 5.)

In January 2019, following his fusion surgery, Plaintiff's surgeon determined that he needed physical therapy (PT).

On March 26, 2019, Defendant Lopez responded after Plaintiff suffered a fall.  Plaintiff claims that Lopez thereby knew that Plaintiff was frail.  (*Id.* ¶ 9.)

From March to May 2019, Plaintiff received twice weekly PT in Tucson and, from June to August, he received additional PT sessions in Casa Grande and Phoenix.  (*Id.* ¶ 6.)  The Tucson physical therapists "found [a] medical necessity" for Plaintiff to have the use of parallel and handicap bars,[5] a wheelchair table, elastic band, heating pad, and typewriter (hereafter "PT-recommended items").  (*Id.* ¶ 7.)  One of the PT sessions focused solely to Plaintiff's ability to transfer safely into and out of a wheelchair and stressed the need for

---

[4]  "TENS is a nonaddictive and noninvasive method of pain control that applies electric impulses to nerve endings via electrodes that are attached to a stimulator by flexible wires and placed on the skin. The electric impulses block the transmission of pain signals to the brain."  *See* https://www.nationalmssociety.org/Glossary#T (last accessed Apr. 20, 2020).

[5]  The Court construes Plaintiff's references to handicap bars to refer to handicap grab bars, available in various configurations.

Plaintiff to apply the brakes, use handicap bars, and maintain proper posture.  (*Id.*)

On April 22, 2019, Plaintiff's annual Special Needs Order (SNO) for his TENS was renewed.

Since Spring 2019, Plaintiff has been placed in holding cells without handicap bars, sometimes for more than an hour.  (*Id.* ¶ 10.)  On May 14, 2019, Plaintiff was placed in a holding cell without handicap bars after he had been without access to a toilet for six hours. Plaintiff was "compelled" by the lack of handicap bars to use a urinal and catheter, but he fell, badly injuring his shoulder, wrist, and hand.  (*Id.* ¶ 11.)  Defendant Lopez responded and threatened Plaintiff with a tazer and verbally abused Plaintiff as Plaintiff lay on the ground in severe pain.[6]  (*Id.*)  Plaintiff "continued" complaining to Defendants Days and Lopez about the lack of handicap bars in holding cells.  (*Id.* at 5 ¶ 12.)

On May 23, 2019, Plaintiff met with Defendant Days about his "need" for the PT-recommended items.  (*Id.* ¶ 13.)  Days refused to authorize the purchase, possession in-cell, or use of the items.  (*Id.*)

On June 1, 2019, Defendant Lopez wheeled Plaintiff toward his cell and ordered Plaintiff to stand to be searched, despite knowing that Plaintiff was "permanently wheelchaired," had a "Do Not Stand" SNO, and needed handicap bars to get out of his wheelchair.  (*Id.* ¶ 14.)  Plaintiff attempted to comply by using a windowsill as support but only managed a crouched posture before collapsing in his wheelchair.  (*Id.*)  As a result of this incident, Plaintiff suffered persistent pain and limited range of motion.  (*Id.*)  On June 3, 2019, Plaintiff submitted a Health Needs Request (HNR) regarding "continued injury from the June 1st Def. Lopez abuse."  (*Id.* ¶ 15.)  Plaintiff submitted a second HNR for psychiatric services, which he alleges were necessitated by Days and Lopez's malicious actions, presumably the denial of the PT-recommended items and being held in cells without handicap bars.  (*Id.*)  On June 5, 2019, Plaintiff sought "psych services" and was referred to a psychiatrist, whom he saw on June 6.  (*Id.* ¶ 16.)  Plaintiff began months-long

---

[6] Although Plaintiff refers to a use of force, he does not assert a claim for excessive force against Defendant Lopez.

TERMPSREF

treatment for major depressive disorder.  (*Id.*)

On June 13, 2019, Plaintiff submitted a grievance regarding Days' denial of the PT-recommended items.  (*Id.* ¶ 17.)  On May 26, Plaintiff met with Days and "pleaded for authorization," but she refused.  (*Id.*)  The same day, Plaintiff's grievance was denied.  (*Id.*)

On July 12, 2019, Plaintiff's property was inventoried because he had been reclassified to maximum custody, *see* Doc. 4 at 74, and Defendant Arnold seized Plaintiff's TENS as contraband, despite having seen the SNO authorizing him to have it.  (Doc. 23 at 5 ¶ 18.)  "Defendant Centurion"[7] refused to return the TENS to him or allow him to use it in the Browning Health Unit despite an awareness of Plaintiff's medical necessity for and use of the TENS, both in maximum and close custody, since 1991.  (*Id.* ¶ 19; Doc. 4 at 74, 76.)  On July 31, 2019, Plaintiff asked Defendant Arnold for the return of his TENS, but Arnold refused.  (Doc. 23 at 5 ¶ 20.)  Plaintiff submitted a grievance and, six weeks after the TENS was taken, the TENS was returned to Plaintiff.  (*Id.*)  During those six weeks, Plaintiff suffered avoidable pain and his range-of-motion decreased as a result of not having the use of the TENS.  (*Id.*)

Prior to July 15, 2019, "[a]rrangements had been routinely made" for placement of handicap bars in every cell occupied by Plaintiff.  (*Id.* ¶ 21.)  But, on July 15, 2019, Days housed Plaintiff in a cell without handicap bars.  (*Id.*)  Plaintiff repeatedly fell while transferring to and from his wheelchair to his bunk and toilet, which injured his shoulder and caused him excruciating pain.  (*Id.*)

On August 13, 2019, Plaintiff saw a urologist.  (*Id.*)  Following his return to the Browning Unit, a Centurion Health Care Provider (HCP), requested authorization for Plaintiff to receive a cystoscopy with prostate vaporization as recommended by the urologist and the HCP.  (*Id.*)  Centurion authorized the procedure, but it was not scheduled.  (*Id.*)  Plaintiff submitted an Inmate Informal Complaint Resolution about not having had the procedure on December 11, 2019, followed by a grievance.  (*Id.* ¶ 23.)  On February 24, 2020, Plaintiff had the procedure, which provided some relief, but the delay in

---

[7] Presumably, Plaintiff is referring to a Centurion employee.

1   scheduling the procedure caused Plaintiff "preventable trauma." (*Id.*)

2       By January 18, 2020, Plaintiff's range-of-motion had further decreased, and he

3   continued to suffer severe pain, so he submitted an HNR requesting authorization to

4   purchase and possess the PT-recommended items. (*Id.* ¶ 24; Doc. 4 at 90.) On February

5   3, 2020, Defendant Olmstead saw Plaintiff but "rubber-stamped" Days' prior denial of

6   authorization for the PT-recommended items. (Doc. 23 at 5 ¶ 24.) On February 6, 2020,

7   Plaintiff submitted an Inmate Informal Complaint Resolution regarding denial to obtain the

8   PT-recommended items. (Doc. 4 at 94.)

9       On February 24, 2020, Plaintiff's cystoscopy with prostate vaporization was

10  performed. (Doc. 23 at 6 ¶ 28.) The surgeon ordered Percocet for pain every six hours.

11  (*Id.*) On February 25, 2020, Plaintiff saw Defendant Olmstead, who told Plaintiff that

12  Centurion's policy was not to prescribe "heavy opiates" in the Browning Unit; Plaintiff

13  received no pain relief for at least 36 hours after surgery, and received only a single dose

14  of codeine in the 48 hours following the procedure. (Doc. 4 at 15 ¶ 16.) Plaintiff asserts

15  that he was denied "any effective post-surgery pain relief." (Doc. 23 at 6 ¶ 28.)

16      On May 30, 2020, with an ongoing decrease in his range-of-motion and increasing

17  severe pain, Plaintiff submitted an HNR asking to be provided the PT-recommended items.

18  (*Id.* ¶ 25.) On June 10, 2020, Plaintiff again saw Olmstead. (*Id.* ¶ 26.) Plaintiff contrasted

19  his range-of-motion the year before with that in 2020. (*Id.*) Plaintiff cited his difficulty

20  standing even using handicap bars for support, inability to take steps, dull thudding lower

21  back pain and occasional burning pain down his right leg and foot, numbness in both feet,

22  neck pain that sometimes prevented movement, continued pain in both hands and

23  occasional "locking" of his left hand and forearm that disrupted sleep, and the inability to

24  perform specialized PT stretches and exercises that had previously helped him. (*Id.*)

25  Olmstead "admitted the difficulty in allowing the devices, given [] Days' disapproval, but

26  stated that her (Olmstead's) denial would encompass a not medically indicated notation."[8]

27

28      [8] The Court construes this allegation to mean that Olmstead acknowledged Days' previous denial of authorization and Olmstead's determination that PT-recommended items were not medically indicated.

**TERMPSREF**

1  (*Id.*)   Absent authorization to purchase and use the PT-recommended items, Plaintiff's

2  range-of-motion has further decreased, and his pain has increased.   (*Id.*)

3        On June 19, 2020, Plaintiff fell as he was attempting to transfer from his wheelchair

4  to the toilet and suffered a severe right-hand injury, which he attributes to the denial of the

5  PT-recommended items, the lack of a shower chair, and Olmstead's denial of tape for

6  TENS pads.   (*Id.* ¶ 27.)   He suffered "bad" pain and surrounding numbness in his right

7  hand.   (*Id.*)

8        According to Plaintiff, Defendants' actions—apparently referring to the denial of

9  the PT-recommended items and deprivation of his TENS—exacerbated existing mental

10  health issues.   (*Id.* ¶ 29.)   Plaintiff claims that Defendant Shinn is responsible for Plaintiff's

11  physical and mental health care but despite being made personally aware of the allegations

12  in Count I, Shinn failed to take corrective action.   (*Id.* ¶ 30.)   Plaintiff does not allege how

13  or when Shinn was made personally aware of such allegations.

14  **B.**     **Count II**

15        The Court construes Count II to assert a claim for denial of access to the courts.   In

16  Count II, Plaintiff alleges the following:

17        On April 23, 2019, Plaintiff filed pro se post-conviction relief petition (PCR) in

18  Pima County Superior Court concerning his conviction and capital sentence.   *See State v.*

19  *Atwood*, Nos. CR1986-14065 and CR1986-15397.[9]   On May 12, 2019, Plaintiff sent an

20  Inmate Letter to Defendant Days to attempt to arrange for Plaintiff to confidentially review

21  his case files, which comprised 95 boxes and dozens of compact disks and flash drives, in

22  _____

23      [9]   In Plaintiff's capital habeas corpus proceedings, *Atwood v. Schriro*, No. 4:98cv00116-TUC-JCC, Plaintiff filed a PCR in state court to exhaust claims.   Ultimately, on January 27, 2014, Plaintiff was denied habeas corpus relief, Doc. 509, and on October 20, 2018, the Ninth Circuit issued its mandate affirming the denial of habeas corpus relief, Doc. 526.

24

25

26      On May 17, 2019, Plaintiff's capital habeas corpus counsel moved to withdraw after Plaintiff filed a PCR asserting that habeas counsel rendered ineffective assistance, Doc. 529.   On June 21, 2019, Doc. 533, the Court granted the motion and appointed Natman Schaye as counsel and ordered Plaintiff's previous counsel to turn over their records to Mr. Schaye.   Plaintiff filed a renewed motion to proceed pro se, Doc. 534, and, following a report filed under seal from Mr. Schaye, the Court denied the motion to proceed pro se, Doc. 542.

27

28

connection with his PCR.  In response to Plaintiff's Inmate Letter, Days ordered Wallis to search Plaintiff's cell.  Through a crack in the wall in the "rec room" adjacent to Plaintiff's cell, Plaintiff saw Wallis reading Plaintiff's "confidential criminal & civil work product." (Doc. 23 at 9 ¶ 3.)

On May 23, 2019, Plaintiff saw Days about his need for "prompt and secure file access."  (*Id.* at 9 ¶ 4.)  Days told Plaintiff that all 95 boxes had to be stored in the Unit property room, which was accessible to staff, and that his CDs would remain with a counselor for viewing on a state computer.  Plaintiff expressed his concern regarding the confidentiality of attorney/investigator/expert notes and reports in his files.  Days became irate and castigated Plaintiff for asserting unprofessional staff conduct and implying that she was unable to control staff.  Plaintiff did not tell Days that he had seen Wallis reading his materials the previous week.  (*Id.*)

On May 31, 2019, Days ordered a second search of Plaintiff's cell.  When Plaintiff returned to his cell, he found his "work product" strewn across his bed with manila folders pulled out of boxes and their contents removed.  (*Id.* ¶ 5.)  Nothing else was disturbed.  On June 2, 2019, Days stopped Plaintiff's phone calls and visits with his "legal team," i.e. his wife/paralegal and an investigator.  (*Id.* ¶ 5.)  The same day, Plaintiff submitted a written complaint about the searches, denial of access to his case records, and halting phone calls with his wife/paralegal and investigator.  At some point, the Pima County Superior Court set a June 7, 2019 deadline in Plaintiff's pending PCR.  (*Id.* at 10 ¶ 10.)

On June 3, 2019, Plaintiff's wife complained to Days about the cancellation of her visit with Plaintiff.  (*Id.* at 9 ¶ 8.)  Also, on June 3, 2019, Plaintiff submitted an emergency request for a legal call with his paralegal, i.e., his wife, and an Informal Resolution Complaint.  (*Id.* at 10 ¶ 10.)  According to Plaintiff, Days' standing order of "no legal team contact" resulted in the denial of another call, prompting Plaintiff to submit another Informal Resolution Complaint.  (*Id.*)  On June 9, 2019, Plaintiff sent an Inmate Letter to Days "pleading for legal team access."  (*Id.* ¶ 11.)  On June 10, 2019, Plaintiff met with Days and unsuccessfully sought confidential case file access.  (*Id.* ¶ 12.)  On June 26, 2019,

Plaintiff again met with Days, this time seeking the easing of restrictions on phone calls with his "legal advisors" and confidential access to his records, both of which requests Days denied.  (*Id.* ¶ 13.)  Plaintiff's wife/paralegal also contacted Days and the Complex Warden about resumption of calls and visits.  (*Id.* ¶ 14.)  On July 1, 2019, Plaintiff submitted a grievance regarding the denial of confidential access to his case files and submitted a second grievance regarding Days' "obstruction of essential pro se litigation requirements."  (*Id.* ¶ 15.)  On July 29, 2019, visitation was resumed in the form of one two-hour non-contact visit per week, "rather than twelve hours of contact visitation weekly."  (*Id.* ¶ 16.)  Plaintiff's July 1 grievances were denied, and on August 6, Plaintiff's subsequent appeals to Defendant Ryan were also denied.[10]

Plaintiff's calls with his wife/paralegal and investigator resumed August 7 for fifteen minutes a week, rather than one hour daily.  (*Id.* ¶ 18.)  On September 7, 2019, Defendant Arnold disallowed material sent to Plaintiff by his wife/paralegal that Plaintiff considered "crucial for use in court."  (*Id.* ¶ 19.)  In October and November, Plaintiff submitted multiple requests to Arnold for the delivery and collection of three legal boxes and six other requests and an Informal to Arnold.  According to Plaintiff, ADC policy provides for weekly deliveries and pick-ups.

## C.    Count III

Plaintiff designates Count III as a claim for retaliation.   Except as otherwise indicated, Plaintiff alleges the following facts in Count III:

As noted in Count II above, in April 2019, Plaintiff filed a successive pro se PCR case in Pima County Superior Court.  (Doc. 23 at 12 ¶ 1.)  In early May 2019, Plaintiff's wife/paralegal called the Browning Unit property room to seek an alternative to having Plaintiff's 95 legal boxes stored in the property room and his dozens of compact disks and flash drives being held by an ADC counselor to be viewed on an ADC computer.  Property Officer Burchett told her that any deviation had to be approved by Defendant Days.

---

[10]  Plaintiff refers to Shinn having denied his grievance appeals however, Shinn did not become the ADC director until October 2019.

TERMPSREF

On May 12, 2019, Plaintiff sent an Inmate Letter to Days seeking a "more secure method of storing the case files th[a]n in property." (*Id.* ¶ 3.)  On May 15, 2019, Days ordered Wallis to search Plaintiff's cell and Plaintiff observed Wallis reading Plaintiff's confidential criminal and civil[11] "work product." (*Id.* ¶ 4.)

On May 23, 2019, Plaintiff met with Days about his "need" to immediately and confidentially review his capital case file.[12] (*Id.* ¶ 5.)  Days denied Plaintiff's requests.  At the conclusion of the meeting, Plaintiff told Days about his "profound concern" about "case file work product" being stored in an area accessible to dozens of staff members.  (*Id.*)  Days "excoriated" Plaintiff for suggesting that staff would act unprofessionally and for implying that she was unable to control her staff.  (*Id.* ¶ 6.)  Days ordered Plaintiff to stop complaining about "non-property room storage of the capital case file" and the denial of PT-recommended items; she told Plaintiff that further complaints would result in disciplinary action "and other adverse consequences." (*Id.*)

Plaintiff submitted a May 26, 2019 Inmate Letter to the Complex Warden regarding access to his capital case files and a June 13, 2019 grievance regarding denial of authorization to obtain the PT-recommended items.  (*Id.* ¶ 7.)

On May 31, 2019, Days ordered a second search of Plaintiff's cell and when Plaintiff returned to his cell, he found "work product" removed from envelopes and strewn across his bed.  (*Id.* ¶ 8.)

On June 1, 2019, Plaintiff's visit was terminated early after Plaintiff informed his wife/paralegal and private investigator about a recent medical transport that had arrived late to his appointment.[13] (*Id.* ¶ 9.)  On June 2, 2019, Days "hijacked the inconsequential

---

[11]  Plaintiff refers to *Atwood v. Gay*, No. 4:17cv02682-PHX-JAT).

[12]  At the same meeting, as noted in Count I, Plaintiff also asked for authorization to purchase the PT-recommended items and for access to handicap bars in every cell in which he was placed.

[13]  Plaintiff submitted a copy of the disciplinary concerning the incident.  In the disciplinary, Corrections Officer Venalonzo stated that during the contact visit, she heard Plaintiff "give details of the route that transportation takes when he is transported to Tucson." (Doc. 28-1 at 42.)  Plaintiff was put on notice of the disciplinary on June 2, 2019. (*Id.*)  Plaintiff was found guilty of conspiracy to commit a class A felony, i.e., escape,

TERMPSREF

1   June 1st incident to have Plaintiff written up on a Group A . . . felonious conspiracy

2   charge[] based on having mentioned traffi[c] during a transport" and followed through with

3   the "other adverse consequences" previously threatened by stopping Plaintiff's visitation

4   and phone calls with his "legal team," i.e., Plaintiff's wife/paralegal and investigator.  (*Id.*

5   ¶ 11.)

6          Plaintiff continued to complain, orally and in writing, about: his inability to

7   confidentially review his case files; cell searches; reading of his "work product"; the halting

8   of visitation and phone calls to his wife/paralegal and investigator; an allegedly fabricated

9   disciplinary report; and the denial of PT-recommended items.  (*Id.* ¶ 12.)  According to

10  Plaintiff, Days acknowledged ordering the searches, disciplinary report, and halting of

11  visitation and calls with Plaintiff's wife/paralegal and investigator.  (*Id.*)  On June 5, 2019,

12  the Disciplinary Hearing Officer, Defendant Romney, "acted in concert" with Days'

13  "retaliatory campaign" by arriving at the hearing with a completed disciplinary form

14  finding Plaintiff guilty.  (*Id.* ¶ 13.)

15         On June 18, 2019, Plaintiff signed a settlement in *Atwood v. Gay*, CV 17-02682-

16  PHX-JAT.

17         On June 21, 2019, shortly after embarking on a medical transport for a medical

18  appointment, Plaintiff urgently needed a catheter, which was with his wheelchair in the

19  trunk of the transport vehicle.  Because Plaintiff could not obtain a catheter from the trunk

20  and, apparently, the transport would not stop in order to retrieve a catheter while

21  transporting Plaintiff outside the prison, Plaintiff was returned to the Browning Unit.  After

22  Plaintiff relieved himself, he was confronted by Romney and Days, who claimed that

23  Plaintiff had requested a catheter as part of an escape attempt.  (*Id.* ¶ 15.)

24         On June 25, 2020, based upon being found guilty by Romney of the June 2

25  disciplinary, *see* n. 10, Days reclassified Plaintiff to maximum security, which resulted in:

26  restriction to his cell for 23 hours a day; placement in restraints whenever he left his cell;

27  a 50% reduction in visitation; a temporary cessation of phone privileges; a 95% reduction

28  _____
    which resulted in the loss of early release credit, 90 days Parole Class III, 30 days loss of
    privileges, and 30 days loss of visitation.  (*Id.* at 43.)

in phone privileges, after such privileges were restored; and severe property/store restrictions for an indefinite period.  (*Id.* ¶ 16; *see* Doc. 28-1 at 45.)  Days imposed the sanctions during a June 26, 2019 meeting[14] with Plaintiff in which she sought leverage to get Plaintiff to stop complaining about his asserted lack of confidential file access and denial of the PT-recommended items.  (Doc. 23 at 12 ¶ 17.)  Plaintiff alleges Days reclassified him in retaliation for him voicing complaints and seeking redress of grievances. Subsequently, Plaintiff again sought changes concerning confidential file access and denial of the PT-recommended items and claims Days ordered Plaintiff written up for intimidating another prisoner; however, the next day, the disciplinary was dismissed because video exonerated Plaintiff.[15]  (*Id.*)

On July 1, 2019, Plaintiff submitted three grievances against Days for retaliatory conduct based on the denial of confidential file access and halting visitation and calls with his wife/paralegal and investigator.  (*Id.* ¶ 19.)  Defendant Romney denied the grievances on July 26, 2020.  (*Id.*)  Plaintiff's grievance appeals submitted to then-Director Ryan[16] "failed to gain any remedial action."  (*Id.* ¶ 34.)

On July 12, 2019, Days moved Plaintiff from the death-row wheelchair pod to the death-row security threat group (STG) pod, which also housed active Aryan Brotherhood and Mexican Mafia gang-members.[17]  (*Id.* ¶ 20.)  Days was aware that since Plaintiff's 1984 arrest, both gangs had placed contracts on Plaintiff's life, resulting in his placement in protective housing on several occasions.  (*Id.*)  Plaintiff claims that she moved him to

---

[14]  On June 26, 2019, Plaintiff's wife/paralegal emailed Days seeking visitation, and on June 27, she contacted the Complex Warden about her inability to visit Plaintiff.  (*Id.* ¶ 18.)

[15]  Plaintiff appears to be referring to a June 18, 2019 incident in which he was reported to have spat into another prisoner's cell from his wheelchair.  (Docs. 28-1 at 46; 4 at 118.)  The disciplinary report was issued June 26, 2019, and informally resolved on June 27 by Plaintiff's agreement to avoid the cell at issue after officers' review of the video showed Plaintiff going to another prisoner's cell but did not show Plaintiff spitting.  (*Id.*)

[16]  Plaintiff attributed the denial to Shinn but he did not become the ADC director until October 2019.

[17]  Plaintiff states that he was in the midst of signing settlement documents, apparently referring to the settlement entered in June 2020, "and grievances."  (*Id.*)

the STG pod as retaliation.  (*Id.*)  In the STG pod, Plaintiff huddled behind his in-cell boxes that were stacked in front of his bed while gang-members in the pod threatened to torture and kill him.  (*Id.* ¶ 21.)

On July 15, after listening to threats since his arrival in the pod, Plaintiff passed out in his cell and was taken to the health unit for treatment of a cut to his head and a shoulder injury from the fall.  (*Id.*)  Defendants Days and Romney also went to the health unit, where Plaintiff complained about having been moved to the STG pod.  (*Id.* ¶ 22.)  The same day, Defendant Wallis issued Plaintiff a disciplinary charge for bartering.[18]  (*Id.*; Doc. 28-1 at 49.)  Additionally, Days and Romney moved Plaintiff to a cell that they knew did not have handicap bars, despite Plaintiff's status as an ADA patient who used a wheelchair and who had fallen several times previously.   (Doc. 23 at 12 ¶ 23.)   Plaintiff experienced excruciating pain when he was forced to transfer from his wheelchair to the bed and toilet without handicap bars.  (*Id.*)

On July 21, 2019, Plaintiff appealed his reclassification to maximum custody to then-Director Ryan but received no response.  (*Id.* ¶ 24.)

On July 29, 2019, Defendant Days responded to a July 26 email from Plaintiff's wife/paralegal and falsely claimed to have imposed only a one-day suspension of visitation and phone calls, rather than a two-month suspension.[19]  (*Id.* ¶ 25.)

According to Plaintiff, prison policies required an initial review 180 days following reclassification to maximum custody.  Six months after Plaintiff's reclassification, in December 2019, Plaintiff's counselor, a Corrections Officer III, went to Defendants Days and Romney for approval to reclassify Plaintiff to a lower custody level.  (*Id.* ¶ 27.)  Days and Romney denied reclassification to a lower custody level for a further six months.  (*Id.*)

In February 2020, Plaintiff's wife/paralegal approached Defendant Romney about

---

[18] According to the Inmate Disciplinary Report, Plaintiff admitted to paying prisoner Van Winkle for protection.  (Doc. 28-1 at 49.)

[19]  In the letter, Days stated, "Visits were suspended for that day only.  Inmate Atwood's were suspended."  (Doc. 28-2 at 1.)  Although hardly a model of clarity, it may be that Plaintiff's wife/paralegal was suspended for one day, while Plaintiff's visitation rights were suspended longer and modified to non-contact.

the delayed reclassification.   (*Id.* ¶ 28.)   Romney ordered a 90-day delay of any reclassification, apparently consistent with the December 2019 six-month delay of reclassification. (*Id.*)

In June 2020, Defendant Romney "allowed" reclassification[20] but recommended to Central Office that Plaintiff remain in maximum custody and, apparently, Central Office followed the recommendation. (*Id.* ¶ 30.) On July 6, 2020, Plaintiff appealed to Shinn and Scott, apparently unsuccessfully. (*Id.* ¶ 32; Doc. 28-2 at 5.) Plaintiff is currently housed with prisoners who were returned from the Florence Complex' Central Unit for assaults, weapons, etc. (Doc. 23 at 12 ¶ 30.) Plaintiff "endures" threats and extortion attempts and had a dart shot at him by another prisoner. (*Id.*) Defendants Days and Romney refuse to move Plaintiff back to the death-row wheelchair pod. (*Id.*)

As also addressed in Count IV, Plaintiff additionally alleges that until March 2020, he was provided two hours every other week for sacramental services pursuant to a settlement in *Atwood v. Linderman*, CV 13-00174-PHX-JAT (D. Ariz. Aug. 13, 2014). After Plaintiff commenced this case, but also contemporaneous with the COVID-19 pandemic, Defendants Scott and Shinn denied him such services, even by video.

### D.   Count IV

Plaintiff designates Count IV as a claim for violation of his religious rights based on the following:

On August 13, 2014, Plaintiff settled *Atwood v. Linderman*, CV 13-00174, an action concerning his religious exercise rights.[21]   Under a settlement agreement in that case, former director Ryan and former Pastoral Activities Administrator Linderman, agreed that Plaintiff would receive a religious visit every two weeks, at which he could participate in sacraments. (Doc. 23 at 17 ¶ 2.) Since March 11, 2020, Plaintiff's religious visits have

---

[20]   Romney recommended Plaintiff's return to close custody because he had not incurred a disciplinary for more than a year. (Doc. 28-2 at 3-4.) Warden Hensley approved. (*Id.*)

[21]   The Settlement Agreement did not provide that the Court would retain jurisdiction to enforce it. *Atwood*, CV 13-00174, Doc. 55-1.

TERMPSREF

been denied.  (*Id.* ¶ 3.)  From March to May 2020, Plaintiff approached his counselor, a Corrections Officer III, to seek religious visitation.  (*Id.* ¶ 4.)  On May 3, 2020, Plaintiff submitted a grievance regarding the denial of religious visitation.  (*Id.* ¶ 5.)  Plaintiff states that "reference was made" to the relative safety of "confronting a dozen or so officers and nurses face-to-face daily," in contrast to non-contact religious services every other week with a masked priest and socially distanced staff.  (*Id.*)  On June 9, 2020, Defendant Scott denied the grievance.  (*Id.* ¶ 6.)  Defendant Shinn failed to respond to Plaintiff's grievance appeal.  (*Id.*)

Plaintiff then sought video visitation with a priest, which was also denied.  Plaintiff appealed that denial.

As his injury, Plaintiff alleges that he was denied the ability to exercise his religious rights absent a legitimate penological reason, particularly religious video visitation. Plaintiff claims that Defendants Scott and Shinn were personally informed of Plaintiff's attempt to exercise his religious rights but intentionally denied Plaintiff the ability to exercise his religious rights.  (*Id.* at 17.)

**IV.    Failure to State a Claim**

To prevail in a § 1983 claim, a plaintiff must show that (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage.  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)).  In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

**A.    Count I**

In Count I, Plaintiff asserts a violation of his right to constitutionally adequate medical care.  Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment.  To state a § 1983 medical claim, a plaintiff must

TERMPSREF

- 17 -

show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

. . . .

TERMPSREF

1          **1.    Centurion**

2          Plaintiff sues Centurion, a private corporation.  To state a claim under § 1983 against

3    a private entity performing a traditional public function, such as providing medical care for

4    prisoners, a plaintiff must allege facts to support that his constitutional rights were violated

5    as a result of a policy, decision, or custom promulgated or endorsed by the private entity.

6    *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012); *Buckner v. Toro*,

7    116 F.3d 450, 452 (11th Cir. 1997).  A plaintiff must allege the specific policy or custom

8    and how it violated his constitutional rights.  A private entity is not liable merely because

9    it employs persons who allegedly violated a plaintiff's constitutional rights.  *See Tsao*, 698

10   F.3d at 1138-39; *Buckner*, 116 F.3d at 452.

11         Plaintiff claims that Centurion had a normal practice of refusing treatment that was

12   barred by prison security staff, which adversely affected him.  (Doc. 23 at 7(B).)  He claims

13   that, pursuant to such policy and practice, he was deprived of the use of his TENS for six

14   weeks by Centurion, presumably meaning a Centurion staff member's refusal to give him

15   access to his TENS.  (*Id.*)  While Plaintiff alleges that Centurion had this policy, Plaintiff

16   alleges it was ADC officer Arnold took the TENS from him as contraband following

17   Plaintiff's reclassification to maximum custody, and despite a SNO authorizing him to have

18   it.  (Doc. 4 at 74.)  Plaintiff fails to allege facts to support that Centurion, or any Centurion

19   employee, was in any way involved in the decision to confiscate or deny him access to the

20   TENS.  Accordingly, Plaintiff fails to state a claim against Centurion based on these

21   allegations.

22         Plaintiff also claims that Centurion's usual procedure for outside consultations and

23   treatment involves months of delays in scheduling medically necessary appointments,

24   including Plaintiff's urological procedure, and that, as a result, Plaintiff suffered months of

25   pain and difficulty urinating.  (Doc. 23 at 7 ¶ C.)  Plaintiff further claims that Centurion

26   had a policy against providing "heavy opiates" to prisoners in the Browning Unit, which

27   was not based on medical criteria.  (*Id.* ¶ D.)  As a result, Plaintiff claims that Centurion's

28   policies amounted to deliberate indifference that resulted in debilitating pain to Plaintiff

TERMPSREF

following his cystoscopy.  Liberally construed, Plaintiff sufficiently states a claim against Centurion as to these allegations.

### 2.    Olmstead

Plaintiff claims that despite Olmstead's knowledge of Plaintiff's serious medical conditions and physical decline, she found that the PT-recommended items, handicap bars, or PT were not medically indicated for non-medical reasons, which resulted in physical and mental pain to Plaintiff.  (Doc. 23 at 7 ¶ I.)  Plaintiff sufficiently states a claim against Olmstead and she will be required to respond to Count I.

### 3.    Days

Plaintiff claims that despite knowing of Plaintiff's disabilities that required him to use a wheelchair, Days repeatedly assigned Plaintiff to cells without handicap bars and refused to authorize Plaintiff to purchase and use the PT-recommended items, both of which caused him severe pain and mental anguish and resulted in deterioration of his physical abilities.  (Doc. 23 at 8 ¶ N.)  Liberally construed, Plaintiff sufficiently states a claim against Days in this portion of Count I.

### 4.    Lopez

Plaintiff claims that despite knowing of Plaintiff's serious disabilities, Defendant Lopez failed to ensure that Plaintiff was held in cells with handicap bars, forced Plaintiff to attempt to stand despite a no-standing SNO and, after Plaintiff was injured in a fall, threatened to taze Plaintiff.   (Doc. 23 at 8 ¶¶ O-R.)   Liberally construed, Plaintiff sufficiently states a medical-care claim against Lopez in Count I.

### 5.    Arnold

Plaintiff claims that Defendant Arnold seized his TENS, which he had possessed and used since the 1990s, in maximum and close custody, and for which he had a SNO, and refused to return it until the Unit Deputy Warden ordered its return in response to a grievance. (Doc. 23 at 8 ¶ S.)  As a result, Plaintiff allegedly suffered extreme pain for six weeks until the TENS was returned.  Liberally construed, Plaintiff sufficiently alleges facts to state a claim against Arnold.

TERMPSREF

1

           **6.**    **Shinn**

2

      Plaintiff claims that Shinn is responsible for Plaintiff's physical and mental health

3

care and was aware of the acts alleged by Plaintiff against the other Defendants via

4

Plaintiff's second level grievances but failed to take corrective action.  Plaintiff claims that,

5

as a result of Shinn's failure to act, he suffered extreme physical and mental pain.  (Doc.

6

23 at 8 ¶ T.)  As noted herein, Defendant Shinn became the ADC Director in October 2019,

7

after many of the complained of acts occurred.  Otherwise, Plaintiff's allegations against

8

Shinn in Count I are vague and conclusory.  Accordingly, Plaintiff fails to state a claim

9

against Shinn in Count I.

10

       **B.**    **Count II**

11

      The Court construes Plaintiff's allegations in Count II as asserting a denial of access

12

to the courts.  The right of meaningful access to the courts prohibits officials from actively

13

interfering with inmates' attempts to prepare or file legal documents.  *Lewis v. Casey*, 518

14

U.S. 343, 350 (1996).  The right of access to the courts is only a right to bring petitions or

15

complaints to federal court and not a right to discover such claims or even to ligate them

16

effectively once filed with a court.  *Id*. at 354.  The right "guarantees no particular

17

methodology but rather the conferral of a capability–the capability of bringing

18

contemplated challenges to sentences or conditions of confinement before the courts." *Id*.

19

at 356.

20

      As a matter of standing, for an access-to-courts claim, a plaintiff must show that he

21

suffered an "actual injury" with respect to contemplated litigation.  *Id*. at 349.  To show

22

actual injury with respect to contemplated litigation, the plaintiff must demonstrate that the

23

defendants' conduct frustrated or impeded him from bringing to court a nonfrivolous claim

24

that he wished to present.  *Id*. at 352-53.  In addition to identifying "a nonfrivolous,

25

arguable underlying claim," the underlying claim "must be described in the complaint."

26

*Christopher v. Harbury*, 536 U.S. 403, 414-15 (2002).

27

      "[T]he injury requirement is not satisfied by just any type of frustrated legal claim."

28

*Id*. at 354.  The right of access to the courts "does not guarantee inmates the wherewithal

**TERMPSREF**

to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Id.* at 355.  The nonfrivolous claim must be a direct or collateral attack on the inmate's sentence or a challenge to the conditions of his confinement.  *Id.*  "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* (emphasis in original).

As noted above, counsel has been appointed to represent Plaintiff in post-habeas corpus proceedings.  Even if Plaintiff had not been appointed counsel, Plaintiff does not have a constitutional right to visitation or phone calls with his wife/paralegal and investigator; Plaintiff does not allege, nor does it otherwise appear that he was unable to communicate by other means with his wife/paralegal and investigator or with appointed counsel with respect to access to the state court record.  Plaintiff also fails to state a claim for denial of access to the courts based upon prison officials' purported refusal to store his legal files to ensure confidentiality or give Plaintiff the ability to confidentially review those records.  Moreover, Plaintiff fails to allege an actual injury as to the above actions. Plaintiff was able to file a successive PCR in state court.  Plaintiff fails to identify "a nonfrivolous, arguable underlying claim" or describe such claim(s) in the First Amended Complaint and, therefore, fails to allege facts to support that he was actually injured. Accordingly, the Court will dismiss Count II for failure to state a claim.

## C.    Count III

Plaintiff asserts a claim of retaliation in Count III.  A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claims requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a

TERMPSREF

constitutionally protected right, and (2) that the action "advanced no legitimate penological interest"). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff alleges that Days denied his requests to have confidential access to his 95 boxes of legal materials and dozens of compact disks and flash drives and for more secure storage of his legal materials. Plaintiff fails to allege any facts to support that Days denied his request as retaliation, rather than due to the practicalities of providing him different and more secure storage or confidential access to those materials. This portion of Count III will therefore be dismissed for failure to state a claim.

Plaintiff alleges that in May 2019, Days ordered him to stop complaining about "non-property room storage of the capital case file" and the denial of PT-recommended items and told him that further complaints would result in disciplinary action "and other adverse consequences." Plaintiff alleges that his cell was searched and his "work product" left strewn across his bed. Plaintiff fails to allege facts to support that Days ordered the cell search as retaliation, rather than for security.

Plaintiff further alleges that Days cut off visitation and phone access with his wife/paralegal and investigator and reclassified him to maximum custody as retaliation. However, Plaintiff acknowledges that he was charged and found guilty of a disciplinary infraction, which resulted in his reclassification to maximum security and loss of privileges. Although he asserts that Defendant Romney acted in concert with Days' alleged retaliatory campaign by finding him guilty of the disciplinary by arriving to the hearing with a completed disciplinary form finding him guilty, Plaintiff's disagreement with the disciplinary finding or its basis is not sufficient to support that it was retaliatory, and he has failed to allege any facts to support that Romney found him guilty of the disciplinary as retaliation for Plaintiff's exercise of constitutionally protected rights. Accordingly, these allegations will also be dismissed for failure to state a claim.

TERMPSREF

1       Plaintiff claims that Defendant Romney denied three grievances he filed against

2  Defendant Days for retaliation based on Days' denial of confidential file access and halting

3  visitation and calls following Plaintiff's reclassification.  However, Plaintiff fails to allege

4  facts to support that Romney did so as retaliation for Plaintiff's exercise of constitutionally

5  protected rights.

6       Plaintiff alleges that following his reclassification to maximum custody, Defendant

7  Days caused him to be moved from the death-row wheelchair pod to the death-row STG

8  pod, despite the presence of prisoners in the STG pod who threatened him, and initially,

9  moved him to a cell that Days knew lacked grab bars, despite Plaintiff's ADA status.

10  Plaintiff fails to allege that Defendant Days moved him in retaliation for Plaintiff exercising

11  constitutionally protected rights.  These allegations will be dismissed for failure to state a

12  claim.

13       Plaintiff alleges that after being in maximum custody for six months, Days and

14  Romney denied approval to reclassify Plaintiff to a lower level for an additional six months.

15  However, Plaintiff fails to allege facts to support that they denied the lower custody

16  classification as retaliation for Plaintiff exercising his constitutional rights.  Absent more,

17  he has not stated a claim against Days and Romney on this basis.

18       Plaintiff alleges that although Romney allowed him to be reclassified in June 2020,

19  Romney recommended that Plaintiff remain in maximum custody.  Plaintiff also alleges

20  that Days and Romney have refused to move him back to the death-row wheelchair pod.

21  These allegations, absent more, do not support that Days and Romney acted for retaliatory

22  reasons.  Accordingly, they will also be dismissed for failure to state a claim.

23       Finally, Plaintiff alleges that Defendants Scott and Shinn denied him religious

24  exercise rights.  Plaintiff fails, however, to show that either denied him religious exercise

25  in *retaliation* for him exercising his constitutional rights and, accordingly, this portion of

26  Count III will be dismissed as to Defendants Scott and Shinn.

27       The Court concludes that Plaintiff has failed to state a claim for retaliation.

28  Accordingly, Count III will be dismissed.

TERMPSREF

**D.     Count IV**

In Count IV, Plaintiff asserts the violation of his religious exercise rights.   The Religious Land Use and Incarcerated Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5, prohibits the government from imposing a substantial burden on the religious exercise of an institutionalized person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2).  Therefore, to state a claim under RLUIPA, a plaintiff must allege facts to support that government action has substantially burdened the exercise of the plaintiff's religion without a compelling government interest and by the least restrictive means.  *See Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002).  "[A] 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quotations omitted).  Thus, an institutionalized person's religious exercise is substantially burdened "'where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his belief.'" *Id.*

In addition, "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal quotations and citations omitted).  However, free exercise rights are "necessarily limited by the fact of incarceration[] and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *Id.*  To state a First Amendment free exercise claim, a plaintiff must allege that a defendant substantially burdened his religious practice without a justification reasonably related to legitimate penological interests. *Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008); *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *Warsoldier*, 418 F.3d at 995 (citing *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (pressure on exercise must be substantial)); *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998) (same).  The religious practice or exercise at issue must be rooted in sincerely

held religious belief and not in "'purely secular' philosophical concerns." *Malik*, 16 F.3d at 333 (internal citation omitted).

Plaintiff alleges that since his March 11, 2020 religious visit, he has been denied religious visits, even virtual religious visits.  On June 9, 2020, Defendant Scott allegedly denied Plaintiff's grievance and Defendant Shinn allegedly failed to respond to Plaintiff's grievance appeal.  Plaintiff claims that he is being denied the ability to exercise his religious beliefs, even by video, absent a legitimate penological reason.  Liberally construed, Plaintiff sufficiently states a claim for violation of his religious exercise rights against Defendants Scott and Shinn.

**V.      Claims for Which an Answer Will be Required**

As discussed above, liberally construed, Plaintiff states a claim in Count I against Defendants Centurion, Olmstead, Lopez, Days, and Arnold.  They will be required to respond to Count I.  Further, liberally construed, Plaintiff sufficiently states a claim for violation of his religious exercise rights against Defendants Scott and Shinn, and they will be required to respond to Count IV.

**VI.     Plaintiff's Motion for Injunctive Relief**

In his motion for injunctive relief, Plaintiff sought a preliminary injunction requiring Defendants (1) to allow him to purchase and possess the PT-recommended items, i.e., a wheelchair table, a typewriter, a heating pad, and elastic band; (2) to allow him access to parallel bars in the 50 x 90 foot recreation area during his recreation periods; (3) to install handicap bars in Plaintiff's cell and other areas used by Plaintiff, including visitation rooms, holding rooms, toilets, and showers; (4) to grant Plaintiff "Keep on Person" (KOP) status for his pain management medications or provide such medications at 8-hour intervals; (5) to require the Unit medical clinic to maintain a stock of tramadol to prevent a lapse in medication for Plaintiff; and (6) to prescribe medications recommended by "any" outside doctor.  The Court denied the motion as to Items (2), (4), (5), and (6), and ordered Defendants Days and Shinn to address injunctive relief as to Items (1) and (3).  (Doc. 10). The Court subsequently granted reconsideration and ordered Defendants to also address

1   Item (2).[22]  (Doc. 25).

2       In his First Amended Complaint, Plaintiff realleges his claims concerning Items (1),

3   (2), and (3).  Therefore, the Court considers the motion as to those items.

4       **A.    Standard for Preliminary Injunction**

5       A plaintiff seeking a preliminary injunction must show that (1) he is likely to

6   succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3)

7   the balance of equities tips in his favor, and (4) an injunction is in the public interest.[23]

8   *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Where a movant

9   seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is

10  "subject to a higher standard" and is "permissible when 'extreme or very serious damage

11  will result' that is not 'capable of compensation in damages,' and the merits of the case are

12  not 'doubtful.'"  *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn*

13  *Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

14  "A mandatory injunction orders a responsible party to take action," while "a prohibitory

15  injunction prohibits a party from taking action and preserves the status quo pending a

16  determination of the action on the merits."  *Marlyn Nutraceuticals*, 571 F.3d at 879

17  (internal quotation marks omitted).   "The 'status quo' refers to the legally relevant

18  relationship between the parties before the controversy arose."  *Arizona Dream Act*

19  _____

20      [22]   The Court denied that portion of the motion as moot because in his brief in
    support of his motion, Plaintiff stated "Parallel bars are already present in a recreation area,
21  enabling Plaintiff access during his regular rec times obviates cost and inconvenience."
    (Doc. 4 at 5.)  In a motion for reconsideration, Plaintiff clarified that while parallel bars
22  were in the referenced recreation area, he lacked access to the recreation area containing
    parallel bars, allegedly despite an instruction from former Division Director Carson
23  McWilliams.  (Doc. 11, Exh. B.)

24      [23]  "But if a plaintiff can only show that there are 'serious questions going to the
    merits'−a lesser showing than likelihood of success on the merits−then a preliminary
25  injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,'
    and the other two *Winter* factors are satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*,
26  709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632
    F.3d 1127, 1135 (9th Cir. 2011)).  Under the serious question variant of the *Winter* test,
27  "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset
    a weaker showing of another."  *Lopez*, 680 F.3d at 1072.  Regardless of which standard
28  applies, the movant "has the burden of proof on each element of the test."  *See Envtl.
    Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

TERMPSREF

1    *Coalition v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014).

2        **B.    PT-Recommended Items**

3        In the First Amended Complaint, Plaintiff alleges that his Tucson physical therapists

4    "found [a] medical necessity" for him to have the use of parallel and handicap grab bars, a

5    wheelchair table, elastic band, heating pad, and typewriter.  In their response to the motion

6    for a preliminary injunction, Defendants argue that Plaintiff's motion is moot as to grab

7    bars and that there is nothing in Plaintiff's medical records to support that any medical

8    professional recommended or prescribed the PT-recommended items.

9        **A.    Grab Bars**

10       Defendants argue that Plaintiff's request for grab bars and a shower with grab bars

11   is moot as to the cell in which he is, and has been, housed since July 2019.  They show that

12   Plaintiff was, at most, confined in a cell without grab bars between July 15 and July 17,

13   2019.[24]  They further claim that Plaintiff was only held in the watch cell without grab bars

14   because no other cell was available.  Plaintiff has not disputed that he has grab bars in his

15   current cell and shower, and the Court will deny the motion as to Plaintiff's current cell

16   and shower as moot.

17       Plaintiff argues that Defendants could, and should, have kept him in his former cell

18   until a suitable cell was available in his new pod, which given Plaintiff's disabilities

19   appears reasonable, at least absent any contrary evidence.  Nevertheless, Plaintiff does not

20   dispute that he has grab bars in his current cell and shower and the single relatively brief

21   episode in the summer of 2019 is not sufficient to show a likelihood of success as to grab

22   bars in his current cell and shower.

23       Plaintiff also seeks an injunction requiring grab bars in every area that Plaintiff may

24   have access, including the visitation area and holding cells.  Plaintiff did not specifically

25   identify each of the areas in which he lacked access to grab bars.  Plaintiff referred to his

26   cell and shower, visitation, holding cells, showers, toilets, "etc."  (Doc. 3 ¶ 3.)

27

28

---

[24]  Defendants claim that he was only held in a cell without grab bars or access to a shower with grab bars for 48 hours.  In his reply, Plaintiff states that it was 53 hours.

TERMPSREF

- 28 -

1    In response, Defendants argue that Plaintiff fails to allege or show that grab bars are

2    needed in the visitation area used by him, which they describe as large enough to

3    accommodate maneuvering his wheelchair and containing tables that Plaintiff can use to

4    balance himself if he wishes to stand.  Defendants also argue that holding cells are intended

5    for temporary confinement such that the need for grab bars is unnecessary.  Defendants

6    also contend that the presence of grab bars in holding cells would pose a safety and security

7    threat, "as inmates could dislodge the bars and use them as weapons," absent showing any

8    likelihood that a prisoner in a holding cell would have the time and means to do so.  (Doc.

9    26 at 8.)

10    Plaintiff replies that he is only allowed non-contact visitation and that the visitation

11    area used by him is not the area described by Defendants and is much smaller.  Plaintiff

12    states that while the non-contact visitation area is accessible to wheelchairs, staff will not

13    escort him to a toilet between 8:00-10:00 a.m. and 11:00 a.m. to 1:00 p.m. during weekly

14    visits.  As a result, he contends that he is forced to attempt to use a catheter/urinal without

15    access to a grab bar, which has resulted in him falling.  For that reason, Plaintiff seeks

16    installation of a handicap bar in his visitation area and for associated toilets.  The Court

17    will order Defendants to file a sur-reply to this portion of Plaintiff's reply.

18    With respect to grab bars in holding areas, Plaintiff notes that Defendants have

19    submitted no evidence to support prisoners have been able to dislodge grab bars in holding

20    areas and he notes that two cells in the receiving area holding cells, which are used to

21    search numerous prisoners daily, have grab bars without incident.  Apart from Plaintiff's

22    reply, the Court notes that Defendants have not submitted evidence to support that holding

23    cells are only used for brief periods such that access to a toilet with grab bars is unnecessary

24    for ADA-prisoners.  The Court will grant Defendants leave to file a sur-reply to address

25    these issues.

26    Finally, although not addressed by Defendants, in his reply, Plaintiff states that the

27    recreation areas do not have grab bars with associated toilets.  He states that: the outside

28    50x90 foot recreation area has a urinal, but needs a bar affixed next to it; the outside 10x10

TERMPSREF

foot area lacks a handicap-compliant cage with a bar; the inside 11x22 foot lacks a bar; and the outside 20x20 foot area has chain link fencing and "may not" require a bar.  Plaintiff states that he is unable to always remain at recreation for three hours—implying that he must go back to his cell to use a toilet with grab bars and forfeiting the balance of his recreation and a shower—and that bars in these areas are also necessary to avoid falls. Plaintiff also states that the Health Unit holding cell lacks a grab bar.  Because Plaintiff failed to specifically raise these two areas in his motion, the Court will deny the motion as to these without prejudice.

## B.   Remaining Items

Plaintiff also seeks an injunction to require Defendants to permit him to obtain an elastic band for PT, a heating pad, a typewriter table, and a typewriter and to be afforded access to parallel bars in the 50x90 foot recreation area.  In his Declaration in support of his motion, Plaintiff avers that therapists at Simons PT, and his neurosurgeon, told him that he needed to diligently continue PT on his own in prison and they "advised [him] of the need for a heating pad, elastic band, parallel bars, wheelchair table, and typewriter as medical necessities for rehabilitative efforts."  (Doc. 4 ¶ 3.)  In a February 3, 2019 appointment with Olmstead, Plaintiff told her that his physical condition had improved by using parallel bars, elastic bands, and heating pad and that his therapists had insisted that he use handicap bars at all times, use a wheelchair table to write and eat, and use a typewriter.  (Doc. 4 at 15-16 ¶ 18.)  Olmstead told Plaintiff that none of these items were medically indicated.  (*Id.*)

In a May 8, 2019 Inmate Informal Complaint Resolution, Plaintiff stated that on May 7, 2019, the PT center determined that he needed an elastic band for neck, shoulder, back and leg exercises; use of parallel bars for gait and balance; and a heating pad for his back.  (*Id.* at 56.)  He stated that Medical told him that ADC had a blanket ban on elastic bands and it could not issue a SNO for Plaintiff to possess or use a band.  (*Id.*)  Plaintiff states that similar bans precluded him having a heating pad.  (*Id.*)  Plaintiff further stated that while parallel bars were available in the death-row wheelchair pod recreation area, and

former ADC Division Director McWilliams had stated that Plaintiff be given access to that recreation area, the recreation team and supervisory staff refused to comply with that order, preventing Plaintiff from "accessing medically needed treatment." (*Id.*)  Plaintiff submitted an Inmate Grievance after he did not receive a response to his Informal. (*Id.* at 58.)

On May 23, 2019, Plaintiff asked Days about her refusal to authorize the items, but she "vehemently reiterated her refusal and expressed displeasure at [his] continuing to press" for the items. (*Id.* at 13 ¶ 5.)  After submitting grievances about the refusal, Plaintiff again met with Days on June 26, 2019. (*Id.* ¶ 6.)  When she questioned Plaintiff about why he was continuing to press for the items, Plaintiff states that "reference was made to the grievances and ongoing litigation." (*Id.*)  Days ordered a disciplinary charge—Plaintiff states that it was fabricated, which a coordinator dismissed the next day—and warned Plaintiff again about seeking the items she had already refused to allow. (*Id.*)

In a June 13, 2019 Inmate Grievance, Plaintiff grieves an unidentified Corrections Officer III's confusing response to Plaintiff's request for consistent access to the recreation area with parallel bars, and his request for elastic band, heating pad, and parallel bars. (Doc. 4 at 60.)  Plaintiff stated that his physical therapists wanted him to use parallel bars to regain the ability to walk. (*Id.*)

In a June 21, 2019 HNR, Plaintiff stated that he had understood that a wheelchair lap table had been approved to reduce the strain on his neck and lower back. (Doc. 4 at 62.)  Plaintiff states, "The judge said I need approval from HCP, please let me see him soon[]." (*Id.*)  The response states that Plaintiff was scheduled to be seen on the nurses' line. (*Id.*)  In a June 26, 2019 Corizon Inmate Grievance Response, Facility Health Administrator Demery stated that the medical provider who had seen Plaintiff on April 22, 2019 "did not determine the medical necessity for [Plaintiff] to be issued a heating pad" and use of the recreation area was an ADC issue that had been addressed by ADC in a June 10, 2019 Informal Inmate Response and would not be further addressed. (*Id.* at 64.) Demery stated the grievance was resolved. (*Id.*)

TERMPSREF

- 31 -

In a March 8, 2020 Inmate Grievance, Plaintiff stated that PT had found a need for him to obtain six items for rehabilitation in prison.  (Doc. 8 at 2.)  In the Grievance, Plaintiff stated that Defendants Days and Centurion thwarted his attempts to obtain the items resulting in decreased range-of-motion and increased pain.  (*Id.*)  He further stated that a January 18, 2020 HNR resulted in a February 3, 2020 appointment with an HCP, who opined that the PT items were not medically indicated.  (*Id.*)  Plaintiff indicated that he spoke to HCPs Ortiz and Olmstead and filed an HNR and Informal without success.  In his reply in support of his motion for injunctive relief, Plaintiff notes that Simons PT included a Certification of Medical Necessity when he received PT in Spring 2019 and recommended the remaining items.

Defendants oppose injunctive relief as to these items claiming that they have never been determined to be medically necessary and have submitted numerous exhibits.  In reply, Plaintiff contends that Defendants' Exhibit D reflects that physical therapists recommended in 2019 that Plaintiff continue PT exercises "at home" to maintain his strength, reduce pain, and improve his gait and balance.

Plaintiff's reliance on the exhibits is misplaced.  Exhibit D includes Defendants submitted PT therapy billing statements with notes.

In a June 18, 2019 Corizon Practitioner Consultation Report, Banner Physical Therapist Trevor Dickman, indicated that Plaintiff reported performing previously instructed exercises on his own as tolerated and without issues and referred to postural reinforcement in standing and gait.  Dickman did not appear to recommend further follow-up. (Doc. 26-4 at 5.)  The Report expressly states that prisoners must not be informed of recommended treatment or possible hospitalizations for security reasons.  (*Id.*)  In a June 12, 2019 Report, Dickman indicated that follow-up would be appropriate if patient will through with "HEP" and demonstrates improved strength.  (*Id.* at 6.)  Dickman states that patient should focus on HEP reinforcement and advancement of gait and weight-bearing tolerance.  (*Id.*)  An April 23, 2019 Physical Therapy Recertification Note prepared by Simons PT described an eight week plan for PT, short-term goals, and referred to

modalities as "To Improve (Pain Relief, Decrease Inflammation, Increase Blood Flow, Improve Tissue Healing), Electrical Stimulation (Interferential, C spine), Cryotherapy, Hot Packs." (*Id.* at 31.)  At the bottom of the Note, Angela L. Jennings certified that the PT proposed was medically necessary, she did not certify that Plaintiff needed access to an elastic band, heating pad, typewriter table or typewriter, or parallel bars.  Quite simply, it was a proposed plan of care.  (*Id.*; *cf.* Doc. 26-4 at 37.)  Similarly, a March 21, 2019 Physical Therapy Initial Examination, contained a plan of care and short term goals for PT and referred to modalities "To Improve (Pain Relief, Decrease Inflammation, Increase Blood Flow, Improve Tissue Healing), Electrical Stimulation (Interferential, C spine), Cryotherapy, Hot Packs." (*Id.* at 51.)  As with the April 23, 2019 Note, Angela L. Jennings certified that the proposed PT proposed was medically necessary.  In short, contrary to Plaintiff's contention, Defendants' Exhibit D does not show that his treating PTs in 2019 prescribed that Plaintiff provided the remaining PT items.

It is unsurprising that physical therapists would recommend that a patient continue exercises at "home" and recommend the use of the items that Plaintiff used at offsite PT sessions, that is not sufficient to show that they prescribed those items as "medically necessary."  Further, even if Plaintiff had demonstrated that his offsite physical therapists had prescribed the balance of PT-items, Defendants have submitted evidence that prison medical staff subsequently determined that the remaining items were not medically indicted.  Disagreements among medical providers is not sufficient to prevail on a medical care claim or establish a likelihood of success on such claim.  Finally, although the Court concludes that Plaintiff has not shown that a medical professional has prescribed access to parallel bars and thus failed to establish a likelihood of success on the merits of that claim, regular access to parallel bars during recreation could benefit Plaintiff's quality of life and possibly reduce the need for future medical interventions and assistance while Plaintiff remains incarcerated.

For the reasons discussed, the Court will deny Plaintiff's motion for injunctive relief in part and will require Defendants to file a sur-reply in part.  Defendants must file a sur-

TERMPSREF

reply as to access to grab bars in the visitation area used by Plaintiff in non-contact visitation and in holding cells.

## VI. Warnings

### A. Release

If Plaintiff is released while this case remains pending, and the filing fee has not been paid in full, Plaintiff must, within 30 days of his release, either (1) notify the Court that he intends to pay the unpaid balance of his filing fee within 120 days of his release or (2) file a non-prisoner application to proceed in forma pauperis. Failure to comply may result in dismissal of this action.

### B. Address Changes

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure. Plaintiff must not include a motion for other relief with a notice of change of address. Failure to comply may result in dismissal of this action.

### C. Copies

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files. Fed. R. Civ. P. 5(a). Each filing must include a certificate stating that a copy of the filing was served. Fed. R. Civ. P. 5(d). Also, Plaintiff must submit an additional copy of every filing for use by the Court. *See* LRCiv 5.4. Failure to comply may result in the filing being stricken without further notice to Plaintiff.

### D. Possible Dismissal

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)     Plaintiff's First Amended Complaint lodged at Doc. 23 **must be** filed as of the date that it was lodged.

TERMPSREF

- 34 -

(2)     Plaintiff's motion to supplement the Complaint (Doc. 22) is **denied**.

(3)     Plaintiff's motion for a preliminary injunction (Doc. 3) is **denied in part.** The motion is **denied except as to grab bars in the visitation area(s) used by Plaintiff and in holding cells, and associated toilet facilities**.  No later than **10 days** from the filing date of this Order, Defendants must file a sur-reply to Plaintiff's reply in support of his motion for injunctive relief as discussed herein.

(4)     Counts II and III are **dismissed** without prejudice.

(5)     Defendants Wallis and Romney are **dismissed** without prejudice.

(6)     Defendants Centurion, Olmstead, Lopez, Days, and Arnold must answer Count I, as set forth herein, and Defendants Shinn and Scott must answer Count IV.

(7)     The Clerk of Court must send Plaintiff a service packet, this Order, and both summons and request for waiver forms for the unserved Defendants Centurion, Olmstead, Lopez, and Scott.

(8)     Plaintiff must complete[25] and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(9)     If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and First Amended Complaint on any unserved Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served. Fed. R. Civ. P. 4(m); LR Civ 16.2(b)(2)(B)(ii).

(10)    The United States Marshal must retain the Summons, a copy of the First Amended Complaint, and a copy of this Order for future use.

(11)    The United States Marshal must notify the unserved Defendants of the commencement of this action and request waiver of service of the summons pursuant to

---

[25] If a Defendant is an officer or employee of the Arizona Department of Corrections, Plaintiff must list the address of the specific institution where the officer or employee works.  Service cannot be effected on an officer or employee at the Central Office of the Arizona Department of Corrections unless the officer or employee works there.

TERMPSREF

Rule 4(d) of the Federal Rules of Civil Procedure.  The notice to the unserved Defendants must include a copy of this Order.

(12)    A Defendant who agrees to waive service of the Summons and First Amended Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

(13)    The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

(a)    personally serve copies of the Summons, First Amended Complaint and this Order upon Defendant pursuant to Rule 4(e)(2) and Rule 4(h)(1) of the Federal Rules of Civil Procedure; and

(b)    within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant.  The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, First Amended Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(14)    The Defendants must answer the First Amended Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(15)    Any answer or response must state the specific Defendant by name on whose

TERMPSREF

behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(16)    This matter is referred to Magistrate Judge John Z. Boyle, including Plaintiff's motion to compel (Doc. 32), pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

(17)    The Clerk of Court must promptly send a copy of this Order to Defendants' counsel at Lucy.Rand@azag.gov.

Dated this 9th day of September, 2020.

James A. Teilborg
Senior United States District Judge

TERMPSREF