WO                                                                                                                          SC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Frank Jarvis Atwood,                                    No. CV 20-00623-PHX-JAT (JZB)

           Plaintiff,

v.                                                                       **ORDER**

Panaan Days, et al.,

           Defendants.

**I.  Procedural Background**

       Plaintiff Frank Jarvis Atwood, who is confined in the Arizona State Prison Complex-Eyman, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983, a motion for injunctive relief (Doc. 3) with supporting brief (Doc. 4), and paid the filing and administrative fees (Doc. 9).  In an April 29, 2020 Order, the Court ordered Defendants Days, Arnold, and Shinn to answer the Complaint and ordered Days and Shinn to respond to the motion (Doc. 10).

      On July 10, 2020, Defendants Arnold, Days, and Shinn filed their Answer to the Complaint (Doc. 20).  On July 21, 2020, Plaintiff filed "Plaintiff's Notice of Filing an Amended Complaint (as Matter of Course) and Motion to Supplement the Complaint" (Doc. 22) and lodged a proposed First Amended Complaint (Doc. 23).  In a September 9, 2020 Order (Doc. 37), the Court ordered Plaintiff's First Amended Complaint filed and ordered Defendants Centurion, Olmstead, Lopez, Days, Arnold, Shinn, and Scott to answer Counts I and IV of the First Amended Complaint (Doc. 37).  Plaintiff then filed a second

motion for injunctive relief (Doc. 45) concerning the discontinuation of tramadol to treat Plaintiff's pain and the Court ordered Defendants Centurion and Olmstead to respond to that motion (Docs. 47, 56). Meanwhile, Magistrate Judge Boyle granted Plaintiff's motion to file a Supplemental Complaint as to Count I (Docs. 51, 52), and this Court ordered Centurion and Olmstead to respond to the Supplemental Complaint (Doc. 56). In the same Order, the Court denied the balance of Plaintiff's first motion for injunctive relief.

On October 2, 2020, Defendants Centurion and Olmstead filed waivers of service, (Docs. 47, 48.) They were subsequently ordered to file an answer to the Supplemental Complaint and to respond to Plaintiff's second motion for injunctive relief (Docs. 60, 66). Defendants Centurion and Olmstead have filed a response to the second motion for injunctive relief (Doc. 81) and Plaintiff has filed a reply (Doc. 82). Plaintiff has also filed two requests for judicial notice (Docs. 77, 80).

On October 28, 2020, Plaintiff filed a third motion for injunctive relief concerning the suspension of in-person religious visitation (Doc. 59). The Court ordered Defendants Shinn and Scott to respond to that motion (Doc. 60). On November 12, 2020, Defendants filed their opposition to the motion (Doc. 64). On November 20, 2020, Plaintiff filed his reply (Doc. 65).

**II.  Standard for Injunctive Relief**

A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.[1] *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Where a movant

---

[1] "But if a plaintiff can only show that there are 'serious questions going to the merits'−a lesser showing than likelihood of success on the merits−then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under the serious question variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072. Regardless of which standard applies, the movant "has the burden of proof on each element of the test." *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). "A mandatory injunction orders a responsible party to take action," while "a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals*, 571 F.3d at 879 (internal quotation marks omitted). "The 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014).

**IV.    Plaintiff's Second Motion for Injunctive Relief**

In his second motion and brief, Plaintiff seeks injunctive relief based upon allegations contained in his Supplemental Complaint (Doc. 52). In the Supplemental Complaint, Plaintiff alleges the following:

As of September 2020, Plaintiff had been prescribed tramadol, and ibuprofen, for his severe spinal pain for years.[2] Since February 2020, Olmstead had prescribed 50 mg of tramadol in the morning and afternoon and 100 mg at night.[3]

On September 16, 2020, Plaintiff submitted an HNR to Olmstead requesting a renewal of his Tramadol prescription. The evening of September 17, a night nurse told Plaintiff that Olmstead had discontinued the 100 mg dose of Tramadol at night. Plaintiff gave the night nurse an HNR asking Olmstead to renew the 100 mg dose or temporarily provide him codeine. Also, on September 17, Plaintiff submitted an emergency grievance for ibuprofen and tramadol, or codeine, for pain and inflammation.

---

[2] Various other medications had been prescribed to Plaintiff to alleviate his severe pain but were discontinued as ineffective or causing adverse side-effects. (Docs. 63 at 28; 63-1 at 8, 9, 10; 82-1 at 8.)

[3] Prior to February 2020, Olmstead or other medical providers had prescribed Plaintiff 50mg of Tramadol three times a day.

On September 18, 2020, Plaintiff lodged another HNR with Olmstead reporting severe pain and that he was sleeping less than two hours at night without the 100 mg dose of tramadol.  Plaintiff also submitted an Informal Resolution regarding Olmstead's stoppage of the 100 mg dose of tramadol.  Because the night dose of tramadol was discontinued, Plaintiff went 19 hours, from 3:00 p.m. to 10 a.m., without receiving tramadol, which resulted in worsening pain, and an inability to sleep.

On September 19, Plaintiff submitted another HNR to Olmstead saying that he was only able to sleep an hour and a half due to severe pain.  He also reported falling when transferring from his bed to his wheelchair.  Olmstead told "Nursing" to respond "no tramadol until Plaintiff's appointment with Olmstead."

On September 20, an unidentified person told Plaintiff that Olmstead had discontinued tramadol for him entirely.  Plaintiff submitted an emergency grievance.  He also submitted another HNR reporting severe back, neck, and shoulder pain.  At that juncture, Plaintiff had received no tramadol for 22 hours, had fallen a second time, and was suffering from withdrawal symptoms, including flushes, chills, cramps, nausea, and restless legs.  At 12:30 p.m. that day, Plaintiff went to the health unit where a nurse told him that she had made Olmstead aware of his multiple HNRs.  Olmstead "persisted" in "no Tramadol or alternative, at least until a 9/23 visit[.]"  (Doc. 52 ¶ 37.)  The week of September 21, 2020, Olmstead reordered ibuprofen for Plaintiff.  (Doc. 52 ¶ 38.)

On September 23, 2020, Plaintiff saw Olmstead, who told him that because tramadol was addictive, she would no longer prescribe it to him or do anything for his withdrawal symptoms and was "unconcerned" about his falls.  (Doc. 52 ¶ 38.)  Plaintiff claims that Olmstead stopped or failed to provide him medically necessary medication for his pain and inflammation.  He further claims that Olmstead stopped tramadol without weaning him from it first, despite knowing about withdrawal problems.  Plaintiff alleges that it was only shortly after this Court's September 9, 2020 Order that Olmstead reduced and then eliminated the tramadol.  He claims that she delayed prescribing ibuprofen for his severe pain.

### A.     Relief Requested

Plaintiff seeks an order requiring that he be provided tramadol three times a day, with 50 mg doses in the morning and afternoon and a night dose of 100 mg. (Doc. 45). Plaintiff alleges that immediately after the Court ordered the First Amended Complaint served on Olmstead, Olmstead reduced by half the amount of tramadol Plaintiff had been receiving since February 2020. Olmstead later stopped Plaintiff's tramadol altogether. Plaintiff asserts that she did so as retaliation for his lawsuit against her[4] and alleges that discontinuation of tramadol for his severe pain amounted to deliberate indifference to his serious medical needs.

### B.     Defendants' Response

In their response to Plaintiff's motion, Defendants Olmstead and Centurion point out that neither was served in this case until September 28, 2020,[5] *after* Plaintiff's tramadol doses had been reduced and then stopped, thus refuting Plaintiff's assertion of retaliatory conduct. (Doc. 81.) Defendants also argue that, at most, Plaintiff's claim represents a disagreement with the diagnosis and recommendations of his providers.[6] Defendants submit evidence reflecting the following:

On September 19, 2020, Plaintiff's tramadol prescription expired. (Doc. 81-1 at 3.) At Plaintiff's September 23, 2020 provider visit, Olmstead declined to renew a prescription for tramadol in light of Plaintiff's age (64), comorbidities,[7] and risk factors associated with Plaintiff's previous medication usage. (*Id.* at 5-13.) Instead, Olmstead prescribed

---

[4] Plaintiff included a retaliation claim in the Supplemental Complaint, which was dismissed. As discussed below, Plaintiff fails to provide evidence to support that Olmstead knew that he had named her as a Defendant in this case when she reduced and then stopped prescribing him tramadol.

[5] Waivers of service of summons were filed on October 2, 2020. (Docs. 48, 49.) On October 13, 2020, Plaintiff's Supplemental Complaint was lodged and was not filed until October 13, 2020 (Doc. 52).

[6] "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

[7] Including hypertension, spinal stenosis, disc degeneration, cervical spondylosis, hyperlipidemia, anemia, and coronary artery disease. (*See* Doc. 81-1 at 26.) In her Affidavit, Olmstead also notes that Plaintiff was a fall risk. (*Id.* at 43 ¶ 5.)

duloxetine (Cymbalta), an alternative non-narcotic medication for Plaintiff's pain. (*Id.* at 12.) During the visit, Plaintiff told Olmstead that he would raise the interruption of tramadol in court. (*Id.*)

On October 27, 2020, Plaintiff had a telemedicine chronic care appointment with a provider concerning his anemia.[8] (*Id.* at 15-29.) During the visit, Plaintiff discussed his chronic pain and desire to be prescribed tramadol for it. (*Id.*) Plaintiff reported that duloxetine and Tylenol were not relieving his pain. (*Id.*) The provider noted that Plaintiff's situation required an evaluation by an onsite provider and a discussion with Dr. Stewart regarding other pain management options. (*Id.*) The provider prescribed the use of Tylenol for pain rather than NSAIDS, because of Plaintiff's history of duodenal ulcer, liver damage, and anemia; noted that an onsite provider needed to evaluate his pain; discontinued duloxetine because of its side effects and failure to alleviate his pain; prescribed the use of topical aspercream lidocaine patches for pain; and ordered laboratory testing concerning his anemia.[9] (*Id.* at 23, 26, 27.) The provider indicated that she would attempt to have Plaintiff seen in pain management and would discuss other management options with Dr. Stewart. (*Id.* at 23.)

On November 17, 2020, Olmstead saw Plaintiff to discuss pain management and Plaintiff requested an MRI to assess spinal deterioration. (*Id.* at 31-41.) Plaintiff also requested more effective pain medication. (*Id.* at 31-32.) In addition, Plaintiff reported difficulty with the application of the pain patches on his back, although he was able to apply them during the appointment. (*Id.*) Olmstead conferred with Assistant Director of Nursing Wischuesen about how to assist Plaintiff in applying the patches properly. (*Id.*) They agreed to open the packaging for the patches and to cut them in half so that Plaintiff could more easily apply the patches on his back. They also offered to place Plaintiff on the nursing line each day so that nursing staff could apply the patch, but Plaintiff refused

---

[8] Physician's Assistant Bellene Racowsky. (Doc. 81-1 at 15.)

[9] The provider also ordered monitoring of his blood pressure and follow-up in six months and submitted a request for a CT/MRI of a lesion on Plaintiff's liver. (Doc. 81-1 at 26.)

because he did not want to report every day to medical. (*Id.*) In her notes, Olmstead stated that an MRI was reasonable under the circumstances and would be necessary for consideration of epidural steroid injections for pain. (*Id.* at 39.) Olmstead indicated that she began the process to obtain an MRI that day. (*Id.*) Olmstead noted that she had made clear to Plaintiff that an MRI would be sought in connection with a decision about epidural pain injections and not as a basis to prescribe oral narcotics. (*Id.*) Olmstead also noted that Plaintiff had been receiving tramadol for years but that it had been discontinued in light of Plaintiff's age and medical history and the absence of clinical findings to support the use of opioids. (*Id.* at 31 and at 43 § 6.) She noted that it was "reasonable to consider" a lumbar spine MRI and a repeat cervical spine MRI to assess whether Plaintiff had suffered further degeneration, and that MRIs would also be necessary to consider whether an epidural steroid injection would be appropriate. (*Id.* at 39.) Olmstead stated that she would submit an MRI request to "Rubicon MD E-Consult"[10] to ensure proper imaging plan "before submitting for consult in "EMR." (*Id.*) She noted that she told Plaintiff that the MRI would be for purposes of a pain consultation concerning steroid injections and not as a basis for prescribing oral narcotics, which are managed by the "yard provider." (*Id.*)

On November 27, 2020, Olmstead noted that "per Rubicon MD E-Consult neuros[ur]g[11] agrees MRI would be next appropriate diagnostic" and was compatible with Plaintiff having a cervical titanium plate. (*Id.* at 46.) She noted that she had "submitted" for MRIs of Plaintiff's cervical and lumbar spine per "Rubicon MD E-Consult Recs." (*Id.* at 53.) The record does not reflect whether Centurion has authorized the MRIs or whether the MRIs have been performed.

In her Affidavit, Olmstead avers that she has been Plaintiff's provider since December 2019. (Doc. 81-1 at 43 § 3.) She further stated:

---

[10] According to its website, RubiconMD eConsults "enable[s] primary care clinicians to easily and quickly discuss their patient cases with top specialists, so they can provide better care[.]" *See* https://www.rubiconmd.com/ (last accessed December 30, 2020).

[11] Apparently referring to neurosurgeon.

> I can avow that the medical decision has been made, after full review of his medical chart, repeat examinations and other testing, that his condition does not require the use of opioid medications, including Tramadol. Tramadol has been at times, a part of his prescription medication regimen, however there is no medical indication to continue this medication at this time. Narcotics are very powerful medications that should only be used in the appropriate case and for the shortest duration needed, which is how they were used.

(*Id.* § 4.)[12]

### C.  Plaintiff's Reply

In his Reply, Plaintiff notes his longstanding use of tramadol for severe pain. He provides copies of records reflecting that numerous alternatives have been tried and rejected because they did not alleviate his pain or had adverse side-effects. He contends that he is entitled to injunctive relief to require the resumption of tramadol for his severe pain.

Documents attached to his Reply, including portions of his medical records dating back to 1990, reflect his longstanding spinal issues.[13] The attachments to the Reply reflect the following:

On December 11, 2018, neurosurgeon Feiz-Erfan noted that if Plaintiff's neck pain failed to significantly improve following surgery on cervical vertebrae -4-5, surgery on cervical vertebrae 2-3 might be warranted. (Docs. 82 at 24; 84 at 33.) On February 4, 2020, Defendant Olmstead prescribed tramadol three times daily for 90 days.[14] (Doc. 82-1 at 8.) Olmstead noted that various other alternatives had been tried but found ineffective or not tolerated. (*Id.*) On June 1, 2020, Olmstead renewed tramadol for Plaintiff for 90

---

[12] The Court notes that Olmstead's averments that Plaintiff was prescribed tramadol "at time" is contradicted by the submitted records reflecting that he had been receiving tramadol for years.

[13] It is undisputed that Plaintiff suffers from several spinal conditions that cause significant pain, result in falls, and limit his activities. However, it appears that Plaintiff also suffered falls while he was taking tramadol, and it is not apparent that discontinuation of tramadol has increased the risk of falls.

[14] As described above, two 50 mg doses in the morning and afternoon and 100 mg dose at night.

days, with an expiration date of September 7, 2020. (*Id.* at 9, 10.) Presumably in conjunction with Plaintiff's September 23, 2020 appointment, Olmstead ordered lumbar spinal x-rays. (*Id.* at 22.) Olmstead received the results on September 30, 2020, in which Dr. Morrison stated:

> The bones demonstrate diffuse demineralization. No lytic or blastic lesions are present. There is mild endplate compression. Decrease disc space and marginal osteophyte formation is present throughout. There is scoliosis. CONCLUSION: Scoliosis, degenerative disc disease, and spondylosis.

(*Id.* at 22.)

On November 23, 2020, Plaintiff fell, hit his nose on his bed railing, and "awoke" on his cell floor; as he tried to get back on his bed, he fell again, injuring his elbow. (Doc. 82 at 2.)

### D. Discussion

As an initial matter, contrary to Plaintiff's assertion, he seeks mandatory injunctive relief rather than prohibitory injunctive relief because when he filed his motion, he was no longer receiving tramadol, and in his motion, he seeks resumption of his prior pain treatment, i.e., use of tramadol. Thus, the nature of the relief sought is mandatory, not prohibitory.

Secondarily, there is no evidence to support that Olmstead reduced and then discontinued tramadol in retaliation for Plaintiff's lawsuit against her. Treatment with tramadol was discontinued before either Olmstead or Centurion were served and Plaintiff has not submitted evidence to support that either knew they were named prior to service.

As to the merits, there is no meaningful dispute that Plaintiff suffers from severe spinal pain, a serious medical condition. There is also no dispute that Plaintiff has tried various other medications to alleviate his pain, all of which were discontinued as ineffective or causing adverse side-effects. Defendants do not dispute that tramadol alleviates the severity of Plaintiff's pain, and the records before the Court reflect that he was prescribed tramadol for nearly ten years by multiple medical providers including, most recently, Defendant Olmstead.

However, the evidence before the Court supports that Olmstead declined to continue to prescribe tramadol to Plaintiff due to its addictive properties and as contraindicated by Plaintiff's advancing age and other medical conditions and medications, i.e., for medical reasons. Plaintiff does not dispute that tramadol is addictive or that continued use is contraindicated by his age and other conditions and medications. And as discussed above, Plaintiff fails to demonstrate that Olmstead discontinued tramadol for non-medical reasons.

Moreover, while Olmstead declined to continue prescribing Plaintiff tramadol, she has taken steps to address Plaintiff's pain by other means. The evidence before the Court reflects that Olmstead has sought authorization for MRIs of Plaintiff's lumbar and cervical spine to assess whether there has been further deterioration, which could support surgery or the epidural spinal injections to alleviate his pain without the risks posed by continuing to take tramadol long-term. In addition, Olmstead has facilitated the provision of lidocaine pain patches, which Plaintiff concedes give him some relief. In short, while Olmstead discontinued prescribing Plaintiff tramadol, she is seeking alternative means to treat his pain, such as epidural injections, referral to pain management, and, possibly, additional surgery. That is sufficient to refute an allegation that Olmstead acted with deliberate indifference to Plaintiff's serious medical needs. Plaintiff therefore fails to establish a likelihood of success on the merits of his medical claim concerning discontinuation of tramadol.

To the extent that Plaintiff is suffering increased pain and disability, those are symptoms of his underlying medical conditions. They are not alone sufficient to establish irreparable injury—at least at this juncture—where Defendants are evaluating the use of methods other than oral narcotics to address his severe pain. Inasmuch as Plaintiff has not demonstrated a likelihood of success on the merits or irreparable harm, the Court finds that the balance of the equities and the public interest do not weigh in favor of granting Plaintiff's second motion for injunctive relief.

The Court's conclusion that Plaintiff is not entitled to injunctive relief on this record does not minimize the severe pain and discomfort that he clearly experiences daily. For

that reason, the Court strongly encourages Defendants to expedite consideration of ways to better manage Plaintiff's pain, whether via epidural injections or other means. A prolonged failure to address Plaintiff's severe pain through other means may well warrant consideration of a new motion for injunctive relief.

**V.     Plaintiff's Third Motion for Injunctive Relief**

In his third motion and Count IV of the First Amended Complaint, Plaintiff asserts a claim for violation of his religious exercise rights. Plaintiff alleges the following:

On August 13, 2014, Plaintiff settled *Atwood v. Linderman*, CV 13-00174, an action concerning his religious exercise rights.[15] Under the settlement agreement in that case, former director Ryan and former Pastoral Activities Administrator Linderman agreed that Plaintiff could receive a religious visit every two weeks, during which he could participate in the sacraments with a Greek Orthodox priest. (Doc. 23 at 17 ¶ 2.)

Until March 11, 2020, Plaintiff received a two-hour religious visit every other week, but those visits stopped after visitation was suspended by the Arizona Department of Corrections (ADC) due to the COVID-19 pandemic. (*Id.* ¶ 3.) Both legal and non-legal visitation have been suspended since that time because of the ongoing pandemic. (*See* Doc. 65 at 21.) On May 10, 2020, video visitation was implemented to facilitate prisoner visitation for one 15-minute video visit per week to allow as many prisoners as possible to participate. (*Id.*)

From March to May 2020, Plaintiff approached his counselor, a Corrections Officer III, seeking religious visitation. (Doc. 23 ¶ 4.) On May 3, 2020, Plaintiff submitted a grievance regarding the denial of religious visitation.[16] (*Id.* ¶ 5.) On June 9, 2020, Defendant Scott denied the grievance. (*Id.* ¶ 6.) Defendant Shinn failed to respond to Plaintiff's grievance appeal. (*Id.*)

---

[15] The Settlement Agreement did not provide that the Court would retain jurisdiction to enforce it. *Atwood*, CV 13-00174, Doc. 55-1.

[16] Plaintiff states that "reference was made" to the relative safety of "confronting a dozen or so officers and nurses face-to-face daily," in contrast to non-contact religious services every other week with a masked priest and socially distanced staff. (*Id.*)

- 11 -

At some point, Plaintiff sought video visitation with a priest, which was also denied. Plaintiff appealed that denial. Plaintiff does not identify the persons involved or allege when these events occurred.

As his injury, Plaintiff alleges that he is being denied the ability to exercise his religious rights through in-person religious visitation. Plaintiff claims that Defendants Scott and Shinn were personally informed of Plaintiff's attempt to exercise his religious rights but intentionally denied him that ability by refusing to except him from in-person visitation restrictions and affording longer video visitation for religious visitation. (*Id.* at 17.)

### A.     Requested Relief

In his October 28, 2020 motion, Plaintiff seeks an injunction requiring prison officials to grant him in-person religious visitation. In an October 28 Order, the Court ordered Defendants Shinn and Scott to respond to Plaintiff's motion. The Court also ordered the parties to address in their response and reply (1) whether and how Plaintiff's religious exercise rights can be accommodated in light of the COVID-19 pandemic and (2) the availability and potential frequency and duration of in-person or video visitation. On November 12, 2020, Defendants Days and Shinn filed their opposition (Doc. 64) to Plaintiff's motion. On November 18, 2020, Plaintiff filed his reply to their response (Doc. 65).

### B.     Defendants' Response

In their response, Defendants Shinn and Deputy Warden Days argue Plaintiff's motion should be denied because he fails to state a claim for relief based upon the denial of religious visitation,[17] his claim is moot, and he does not meet the standard for injunctive relief. (Doc. 64.)

Defendants state that they complied with the terms of the settlement in Plaintiff's previous case until the advent of the COVID-19 pandemic. On March 13, 2020, ADC

---

[17] In screening the First Amended Complaint, the Court found that Plaintiff had stated a claim in Count IV against Defendants Shinn and Scott for violation of Plaintiff's religious exercise rights. Therefore, the Court does not further consider this contention.

suspended visitation, both legal and non-legal, reevaluating the decision every 30 days in light of the ongoing pandemic. Defendants represent that all visitation is canceled, including legal, Child Protective Services, Consulate, Probation Officers, volunteer program staff, prisoner educators, and in-service training. They represent that prisoners attend court via videoconferencing, rather than in person.[18] Defendants cite the implementation of video visitation for prisoners, initially for 15-minutes per week, and then to 30-minutes per week, to accommodate visitation for as many prisoners as possible during the pandemic.

Defendants argue that Plaintiff has not shown that he will suffer irreparable injury under the circumstances. They note that COVID-19 has the potential to kill those who contract it and argue that the suspension of in-person visitation to prevent the spread of a potentially deadly virus is not an unreasonable impingement on Plaintiff's religious exercise. They further argue that Plaintiff may practice his religion individually or through other means (presumably through reading, writing, meditation, etc.). Defendants dispute Plaintiff's claims that "hundreds" or "dozens" of workers enter his unit daily,[19] representing that only persons necessary to provide food and medical care are admitted to the unit.[20] Defendants argue that the pandemic is a temporary emergency that is beyond the control of the ADC. They represent that video visitation resources are finite, particularly where video conferencing is necessary for court appearances as well as visitation generally. They argue that Plaintiff's unit has approximately 800 prisoners and that it would be unfair to allow Plaintiff video visitation with his priest in addition to general video visitation and that allowing him two-hour visitation every other week with his priest "could mean" other prisoners would not be able to participate in visitation.

---

[18] As alluded to by Defendants, both state and federal courts in Arizona, as elsewhere, have resorted to video-conferencing for court proceedings and suspended jury trials due to COVID-19.

[19] Defendants also note that Plaintiff makes no attempt to reconcile the discrepancy in these estimates.

[20] Defendants also presumably intended to include security staff are admitted to the unit to maintain the safety of prisoners and staff.

Finally, Defendants argue that even if Plaintiff received two-hour visitation every other week, he still would be unable to receive the sacraments, which can only be provided in person.

### C. Plaintiff's Reply

In his reply, Plaintiff argues that Defendants have violated the terms of the settlement in his previous case. Plaintiff claims Defendants are disingenuous in citing the pandemic as the reason for suspending visitation where more than 100 people enter the unit daily. Plaintiff also indicates that a chaplain suggested that he could use his weekly 15-minute video visitation for religious visitation but argues that 15 minutes is not even minimally sufficient and argues that he should not be required to use his general visitation time for religious visitation. He claims, for the first time, that video visits are recorded and are not confidential, which breaks the confessional seal. Further, he agrees that video visitation cannot accommodate the reception of Holy Communion, which Plaintiff describes as the centerpiece of his religious practice. Plaintiff argues that Defendants have failed to show that the suspension of all in-person visitation is the least restrictive means to protect prisoners and staff from contracting COVID-19.

### D. Discussion

To the extent that Plaintiff argues that Defendants' suspension of religious visitation violates the terms of the settlement in his previous case, Plaintiff cannot seek relief in this case on that basis. Standing alone, a settlement agreement cannot serve as a substantive basis for a § 1983 claim for relief because it does not create "rights, privileges, or immunities secured by the Constitution and [federal] laws." *Green v. McKaskle*, 788 F.2d 1116, 1123-24 (5th Cir. 1986). Further, failure to comply with the terms of a private settlement agreement, absent more, is not enforceable in federal court. 18 U.S.C. § 3626(c); *see O'Connor v. Colvin*, 70 F.3d 530, 532 (9th Cir. 1995); *cf. Rushdan v. Perbula*, No. 07-15244, 2008 WL 4430669, at *2 (9th Cir. Sept. 8, 2008). Further, section 3626(a) of title 18 imposes limits on prospective relief in any civil action with respect to prison conditions. Parties may enter a "private settlement" that does not comply with the

limitations on prospective relief stated in § 3626(a) only so long as the terms of such agreement are not subject to court enforcement, other than reinstatement of the civil proceeding.[21] A "private settlement agreement" is defined as "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C. § 3626(g)(6).

This Court did not retain jurisdiction to enforce the terms of the settlement in Plaintiff's previous case. Accordingly, Plaintiff cannot seek to enforce that settlement in this case.

To the extent Plaintiff is asserting a claim under RLUIPA, that Act provides that the government may not substantially burden an incarcerated person's religious exercise. If a prisoner establishes that his religious exercise has been substantially burdened, the burden shifts to the defendant to show that the challenged policy furthers a compelling governmental interest and that the policy was the least restrictive means of furthering that compelling governmental interest. *See Uhuru v. Bonnifield*, No. 2:19cv10449, 2020 WL 6534087, at 12 (C.D. Cal. Oct. 27, 2020). Assuming, without deciding, that Plaintiff's religious exercise has been substantially burdened by the suspension of in-person visitation, Plaintiff has not demonstrated that the government lacked a compelling governmental in suspending such visitation to reduce the spread of COVID-19, which can debilitate and kill those who contract it, within ADC facilities. *See Uhuru*, 2020 WL 6534087, at 10 (noting the compelling governmental interest in protecting prisoners from contracting COVID-19). Prisons and jails around State and the country have suspended in-person programs because of the pandemic. *See e.g.*, *Wilson v. Conn. Dep't of Corr.*, No. 3:20cv1567, 2020 WL 7388979, at *2 (D. Conn. Dec. 16, 2020); *Uhuru*, 2020 WL 6534087, at *10 (there is a compelling governmental interest in protecting prisoners and staff from contracting a potentially fatal or debilitating virus); *Payne v. Sutterfield*, No. 2:17cv211, 2020 WL 5237747, at *6 (N.D. Tex. Sept. 2, 2020); *Ousman D. v. Decker*, No.

---

[21] 18 U.S.C. § 3626(c)(2)(A). A party claiming a breach of a private settlement agreement is not precluded from seeking any remedy available under *state* law in *state* court. 18 U.S.C. § 3626(c)(2)(B).

- 15 -

20cv2292, 2020 WL 1847704, at *2 (D. N.J. Apr. 13, 2020). *See also Spell v. Edwards*, 962 F.3d 175, 181-82 (Ho, J., concurring) ("Officials may take appropriate emergency public health measures to combat a pandemic," including assembly rights, even though nothing "supports the view that an emergency displaces normal constitutional standards."); *In re Abbott*, 954 F.3d 772, 784-85 (5th Cir. 2020) (Duncan, J.) (citing cases supporting principle that public health crises may temporarily permit extraordinary government intrusion on constitutional liberties to combat contagion ).

Thus, Plaintiff essentially contends that suspension of in-person visitation is not the least restrictive means of furthering a compelling governmental interest. He points to the dozens of workers who enter his unit daily, but he does not dispute that those workers perform essential functions, such as providing food and medical services to prisoners or ensuring the safety of both prisoners and staff. (Doc. 65 at 7 ¶ 5.) Plaintiff has made no showing that in-person visitation, legal or non-legal, is currently being allowed. Plaintiff also does not dispute that approximately 800 prisoners are confined in his unit or that Defendants have implemented procedures to allow all prisoners at least some video visitation, while in-person visitation is suspended.[22] Further, Plaintiff does not dispute that he has other means to practice his religion, individually through reading, writing, or meditation, or via video visitation or phone calls, during the suspension of in-person visitation.

The Court concludes that given the pandemic and, in particular, the rate of COVID-19 infection throughout Arizona,[23] suspension of visitation is the least restrictive means of furthering the compelling governmental interest in preventing the spread of COVID-19 to prison staff and prisoners. The Court notes that vaccines have been developed and are in the process of being administered as supplies become available. The most recent ADC COVID-19 Management Strategy reflects that prison medical staff have completed the

---

[22] Defendants indicate that video visitation has been increased to 30 minutes a week.

[23] *See* https://azdhs.gov/preparedness/epidemiology-disease-control/infectious-disease-epidemiology/covid-19/dashboards/index.php (last accessed Jan. 8, 2021).

process to be certified to administer the vaccine as supplies become available.[24]

Given the exigencies of the current pandemic, resulting in the temporary suspension of in-person visitation, and Plaintiff's ability to practice his faith via other means until the pandemic subsides,[25] the Court finds Plaintiff has not established a likelihood of success on the merits or the risk of irreparable harm.  Nor does the Court find that the balance of the equities or the public interest tip in Plaintiff's favor.  Plaintiff's third motion for injunctive relief will therefore be denied.

**IT IS ORDERED:**

(1) The reference to Magistrate Judge Boyle is **withdrawn** as to Docs. 45 and 59.

(2) Plaintiff's second motion for injunctive relief (Doc. 45) and third motion for injunctive relief (Doc. 59) are **denied**.

Dated this 12th day of January, 2021.

*James A. Teilborg*
Senior United States District Judge

---

[24] *See* https://corrections.az.gov/covid-19-management-updates, December 28, 2020 (last accessed Jan. 6, 2021) (describing ongoing testing in the prison system and noting that prison medical staff have completed the process to become certified COVID-19 vaccines during the appropriate phases for administration of the vaccines).

[25] Although Plaintiff argues that in-person visitation is necessary for him to receive the sacraments, which he considers the centerpiece of his religious faith, he has not identified when these rites must be administered or how frequently.