MGD

WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Frank Jarvis Atwood, et al.,

                    Plaintiffs,

v.

Panaan Days, et al.,

                    Defendants.

No.  CV-20-00623-PHX-JAT (JZB)

**ORDER**

    Frank Jarvis Atwood (Mr. Atwood), who was incarcerated by the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR), filed this civil rights action pursuant to 42 U.S.C. § 1983 seeking damages and injunctive relief regarding his medical care while imprisoned.[1]  (Docs. 36, 52.)  Mr. Atwood died by execution on June 8, 2022, and Rachel Atwood, the personal representative of Mr. Atwood's estate, was substituted for Mr. Atwood pursuant to Federal Rule of Civil Procedure 25(a).[2]  (Doc. 223.)

    Before the Court is Defendants' Renewed Motion for Summary Judgment (Doc. 230), which Plaintiff, who is represented by counsel, opposes (Doc. 233).

---

[1] Mr. Atwood filed the original Complaint pro se but later obtained counsel.

[2] As personal representative, Rachel Atwood maintains this action pursuant to Arizona's survival statute.  *See* Ariz. Rev. Stat. § 14-3110; *see also Gandy v. United States* 437 F.Supp.2d 1083, 1087 (D. Ariz. 2006) (under Arizona's survival statute, "[t]he claim passes from the decedent to the personal representatives, and becomes an asset of the estate") (citing *Barragan v. Superior Court of Pima Cnty.*, 470 P.2d 722, 724 (Ariz. Ct. App. 1970)).

## I.     Background

On screening the First Amended Complaint (Doc. 36) under 28 U.S.C. § 1915A(a), the Court determined that Mr. Atwood stated Eighth Amendment medical care claims in Count One regarding his progressive spine disease against Defendants Centurion, Olmstead, Days, Lopez, and Arnold, and a religious exercise claim in Count Four against Defendants Scott and Shinn and ordered these Defendants to answer the claims against them.  (Doc. 37.)  The Court dismissed the remaining claims and Defendants.  (*Id*.)  On October 13, 2020, the Court permitted Mr. Atwood to file a supplemental Complaint (Doc. 52) regarding the alleged denial of pain medication for his spinal condition, and the Court required Defendants Centurion, the private corporation that contracted with the ADCRR to provide health care for ADCRR prisoners, and Nurse Practitioner Olmstead to respond to Mr. Atwood's Supplemental Complaint as to Count One.  (Doc. 56.)

On March 7, 2022, the Court granted the Parties' Stipulated Motion to Dismiss Defendants Arnold, Days, Lopez, Shinn, and Scott, and dismissed those Defendants with prejudice.  (Doc. 204.)  Following that dismissal, the remaining claims were Mr. Atwood's Eighth Amendment medical care claims against Defendants Centurion and Olmstead.  (*See id*.)

On January 12, 2021, the Court denied Mr. Atwood's motions for injunctive relief in which he sought, in part, the resumption of the pain medication Tramadol for his spinal condition because the evidence showed that Defendant Olmstead was taking steps to attempt to address Mr. Atwood's severe pain by means other than oral narcotics.  (Doc. 87.)  Those other steps included seeking authorization for MRIs of Mr. Atwood's lumbar and cervical spine to assess whether there was further deterioration, which could support surgery or epidural spinal injections, and providing lidocaine pain patches.  (*Id*.)  The Court informed Defendants, however, that a prolonged failure to address Mr. Atwood's severe pain through other means may warrant consideration of a new motion for injunctive relief.

After counsel filed a Notice of Appearance on behalf of Mt. Atwood, Mr. Atwood filed another motion for injunctive relief on June 22, 2021, seeking adequate pain relief,

housing in a setting with hands-on wheelchair transfer assistance always available, and evaluation by an orthopedic specialist for his spinal condition.  (Doc. 109.)  On October 29, 2021, the Court held a hearing on the motion, which included expert testimony on both sides, and the evidence received included the results of lumbar and cervical spine MRIs taken in January 2021, and Mr. Atwood's June 2021 visit to a neurosurgeon, Dr. Feiz-Erfan, who wanted a new MRI and recommended epidural injections, physical therapy, and follow up.  (*See* Doc. 173 at 10.)  At the hearing, Mr. Atwood's expert recommended that Mr. Atwood be prescribed a moderate dose of Tramadol because of the drug's prior effectiveness and lack of side effects over many years.  (*Id*.)  In an Order dated December 7, 2021, the Court granted the motion for injunctive relief in part and required that Defendants (1) restart Mr. Atwood's prior prescription for Tramadol, unless a specialist recommended an equally effective alternative pain medication, and (2) schedule the epidural injection(s) recommended by Dr. Feiz-Erfan, unless the injection(s) had already occurred.  (*Id*. at 18-19.)

On February 1, 2022, Defendants filed a Motion for Summary Judgment, and the Motion was fully briefed by the time Mr. Atwood died on June 8, 2022.  On July 21, 2022, the Court denied that Motion for Summary Judgment without prejudice and permitted Defendants to file a renewed motion for summary judgment if a timely motion for substitution was made upon proper service of a suggestion of death of Mr. Atwood.  (Doc. 216.)  Once the personal representative of Mr. Atwood's estate, Rachel Atwood, was substituted as Plaintiff, Defendants filed their Renewed Motion for Summary Judgment.  (Doc. 230.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## III.    Procedural Issue

Although Defendants filed a Statement of Facts in support of their Renewed Motion, Plaintiff did not file a controverting statement of facts or a separate statement of facts with her Response.  Instead, Plaintiff primarily relies on the Court's October 2021 Order granting injunctive relief, asserting that this Order encompasses all of the relevant facts and law and that nothing about the facts or law has changed since then.  (*See* Doc. 233.) Plaintiff argues that Defendants' Motion completely ignores the testimony from the preliminary injunction hearing and the Court's findings of fact based on the evidence

1    presented at that hearing, and the Court should reject this attempt to escape any
2    responsibility for knowingly discontinuing Mr. Atwood's longstanding pain medication
3    prescription, which left Mr. Atwood in constant severe pain for over a year.  (*Id*. at 5.)

4        Defendants Reply that their Motion for Summary Judgment should be granted
5    because the factual findings and legal conclusions made by the Court when ruling on the
6    preliminary injunction motion are not binding at summary judgment and because Plaintiff,
7    by not providing a controverting statement of facts, failed to comply with federal and local
8    rules of civil procedure governing summary judgment motions.  (Doc. 234.)

9        The Court declines Defendants' invitation to summarily grant summary judgment
10   on these bases.  While it is true that "the findings of fact and conclusions of law made by
11   a court granting a preliminary injunction are not binding at trial on the merits," that is
12   because "a preliminary injunction is customarily granted on the basis of procedures that
13   are less formal and evidence that is less complete than in a trial on the merits" in order to
14   preserve the relative positions of the parties until a trial on the merits can be held.  *Univ. of*
15   *Texas v. Camenisch*, 451 U.S. 390, 395, (1981).  But in this case, the record was well
16   developed by the time the Court granted injunctive relief to Mr. Atwood, and Defendants
17   have not presented anything new with their Motion for Summary Judgment that post-dates
18   the preliminary injunction hearing.  Discovery had closed by the time the Court held the
19   hearing on October 29, 2021, with dispositive motions initially due on September 22, 2021.
20   (*See* Doc. 89.)  The dispositive motion deadline was extended due to counsels' need to
21   focus on the injunction hearing and new defense counsel taking over the case, but discovery
22   was not re-opened after the injunction hearing.  (*See* Docs. 141, 179.)  Moreover, at
23   summary judgment, the Court will not rely on its findings of fact in the preliminary
24   injunction phase but on the record as a whole in determining whether there are any
25   questions of material fact.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the
26   cited materials, but it may consider any other materials in the record.").

27       In addition, the fact that Plaintiff did not file a controverting statement of facts is
28   not a basis for summarily granting summary judgment to Defendants because as the

moving party, Defendants must still meet their initial burden of production, and if Defendants fail to meet their initial burden, Plaintiff need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

## IV.   Facts[3]

Mr. Atwood began his incarceration with ADCRR in 1987.  (Doc. 147 ¶ 1.)  His back pain began around 1990, and he was treated for approximately 30 years with oral medications.  (Doc. 109 at 21 ¶ 14 (Decl. of Philip A. Davidson, M.D.).).  Mr. Atwood began using a wheelchair in 2015 and at that time he was classified an ADA (Americans with Disabilities Act) patient.  (Doc. 167 (Hearing Tr. Oct. 29, 2021) at 117.)  From 2011 to September 2020, Mr. Atwood was prescribed Tramadol, which effectively treated his pain.  (Doc. 109 at 23 ¶ 20.)  Mr. Atwood tried numerous other medications, such as Cymbalta, for his pain, but they either failed or he had negative reactions to them.  (Doc. 167 at 61, 121.)

On December 11, 2018, Dr. Feiz-Erfan, MD, a neurosurgeon, saw Mr. Atwood for his complaint of quadriparesis with neck pain.  (Doc. 26-2 at 2.)  Dr. Feiz-Erfan diagnosed Mr. Atwood with degenerative cervical myelopathy, cervical 5-6 with general degenerative disk disease and canal stenosis cervical 2 to cervical 7.  (*Id*.)  Dr. Feiz-Erfan noted Mr. Atwood had "severe stenosis cervical 5-6 with cord signal changes," "moderate canal stenosis of cervical 2-3 with disk bulge and degenerative disk disease throughout," and "cervical 4-5 already blocked together."  (*Id*.)  Dr. Feiz-Erfan discussed the risk and benefits of surgery, and Mr. Atwood agreed to the surgery discussed.  (*Id*. at 3.)  On December 11, 2018, Dr. Feiz-Erfan, MD, performed spinal surgery on Mr. Atwood (Doc. 26-3 at 1) consisting of a "right anterior cervical spine approach decompressive diskectomy, cervical 5-6 with interbody fusion using morselized bone allograft cut into cage format brand name VG2 with plate fixation cervical 5-6[.]"  (*Id*. at 5.) Afterwards,

---

[3] Plaintiff asserts that she will not pursue Mt. Atwood's non-tramadol claims, which were not part of the preliminary injunction dispute (Doc. 233 at 2 n.1), and the Court will not include Defendants' facts that are not related to Mr. Atwood's pain and pain relief issues.

Mr. Atwood attended approximately 18 physical therapy sessions between March and June 2019.  (Doc. 26-4 at 2.)  At each session, the physical therapist noted that Mr. Atwood's "Rehab Potential" was "Fair (Radiculopathy for several years – nerves will have difficulty healing.)."  (Doc. 26-4 at 7, 9, 11, 13, 15, 17, 19, 22, 25, 27, 31, 32, 34, 38, 40, 42, 44, 46, 50.)

Plaintiff's expert, Philip A. Davidson, MD, a board-certified orthopedic surgeon, evaluated Mr. Atwood telephonically and reviewed his medical records; Dr. Davidson stated in a Declaration that Mr. Atwood had not walked since 2017, and without Tramadol, suffered "incomprehensible pain every time he need[ed] to transfer to bed, chair or wheelchair."  (Doc. 109 at 22-23 ¶¶ 17, 19.)  Mr. Atwood only slept sporadically because he could not lie flat and had to sit in his wheelchair or partially recline in bed to minimize the severity of constant pain.  (Id. at 24 ¶ 23.)  Pain interfered with nearly all Mr. Atwood's activities of daily living.  (Doc. 167 at 27-28.)  Without Tramadol, Mr. Atwood's pain was severe at 9 or 10 out of 10, his ability to transfer to and from his wheelchair was decreased, and his sleep was even more compromised.  (Doc. 109 at 27 ¶ 34.)  With Tramadol, Mr. Atwood's pain decreased to a 5 or 6, a moderate and manageable pain level.  (Doc. 167 at 112, 121.)

On February 3, 2020, Mr. Atwood saw Defendant NP Olmstead to discuss the Health Needs Request (HNR) he had submitted requesting an elastic band, wheelchair table, typewriter, heating pad, parallel bars and handicap bars "in all places," meaning in his cell, toilet areas, holding cells and receiving areas.  (Doc. 228 (Defs.' Statement of Facts) ¶¶ 12-13.)  Mr. Atwood reported that his ability to enjoy balance and range of motion continued to decline and he was experiencing increased pain and that he benefited from physical therapy rehab and equipment.  (Doc. 228-1 at 47.)  Mr. Atwood reported he had more trouble sleeping due to neck pain, his back pain was getting worse and he had more swelling in his feet.  (Id.)  Olmstead did a functional assessment of Mr. Atwood and noted that none of his requests would be issued at that time because no medical necessity was indicated; Olmstead also lacked authority to issue a heating pad and elastic band as

ADCRR policy did not allow those items in Mr. Atwood's max custody unit. (Doc. 228 ¶¶ 14-15.) On June 10, 2020, Olmstead saw Mr. Atwood after he again requested these items, and Olmstead noted that Mr. Atwood knew the items were a custody concern and she found no medical necessity for the equipment, but she adjusted his pain medications.[4] (*Id.* ¶¶ 15-17.) Defendants assert that although Mr. Atwood claimed that the denial of requested therapy items caused him increased pain and exacerbated his existing mental health issues, when he saw mental health on June 16, 2020, he reported that his medications were working well and did not mention any mental health concerns related to the physical therapy items. (*Id.* ¶ 18.)

Mr. Atwood's Tramadol prescription expired on September 19, 2020, and at his provider visit on September 23, 2020, his medical chart was reviewed, and Defendants assert that Olmstead did not renew Tramadol due to Mr. Atwood's advancing age (64), comorbidities (hypertension, spinal stenosis, disc degeneration, cervical spondylosis, hyperlipidemia, anemia, coronary artery disease, fall risk), and the risk factors associated with his previous "opioid medication usage." (*Id.* ¶¶ 19-20.) Olmstead prescribed Duloxetine instead, which Defendants assert is "an alternative, comparable medication" to Tramadol and is non-narcotic.[5] (*Id.* ¶ 21.)

Defendant Olmstead asserted in a Declaration that "the medical decision [was] made, after repeat examinations and other testing, that [Mr. Atwood] need[ed] to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects and that had or have been, at times, a part of his prescription medication regimen, and that there [wa]s no medical indication to continue this medication." (Doc. 114-6 at 2 ¶ 4.) According

---

[4] Defendants do not specify what Olmstead did to adjust Mr. Atwood pain medications.

[5] Duloxetine (brand name Cymbalta) is a selective serotonin and norepinephrine reuptake inhibitor that is used to treat depression and anxiety and is also used for diabetic peripheral neuropathy, fibromyalgia, and chronic pain related to muscles and bones. Mayo Clinic, *Duloxetine (Oral Route)*, *available at* https://www.mayoclinic.org/drugs-supplements/duloxetine-oral-route/description/drg-20067247 [permalink: https://perma.cc/RF89-C2LX ] (last visited Feb. 13, 2024).

to Olmstead, "[n]arcotics are very powerful medications that should only be used in the appropriate case and for the shortest duration needed, which is how they have been used." (*Id.*)

Olmstead testified at the preliminary injunction hearing that Centurion's medical director told her it was Centurion's policy "that long-term opioids are not prescribed unless a patient has cancer pain or they are in a hospice setting." (Doc. 167 at 169.) During the hearing, the Court asked Defendants to produce the policy. (*Id.* at 208-209.) In response, Defendants notified the Court that "no formal written policy exists," and they submitted the Declaration of Dr. Rodney Stewart, Centurion's Site Medical Director for ASPC-Eyman. (Doc. 165 at 1.) Dr. Stewart stated that he implemented a policy "that patients are not to be prescribed opioids, such as tramadol, for an extended or indefinite period of time unless that patient is suffering from cancer-related illness or pain, terminal illness with pain, and other serious long-term disease implicating severe pain symptoms." (Doc. 165-1 at 1 ¶ 5.)

At a chronic care telemedicine visit on October 27, 2020, Mr. Atwood discussed his chronic pain and desire for Tramadol and said the Duloxetine and Ibuprofen 600 mg were not relieving his pain. (Doc. 228 ¶¶ 24-25.) Mr. Atwood reported that he could not manage his activities of daily living (ADLs) alone because of severe pain. (Doc. 81-1 at 16.) The telemedicine provider discontinued Duloxetine, prescribed Tylenol for pain due to Mr. Atwood's history of ulcer, liver damage and anemia, and noted that the onsite provider needed to evaluate Mr. Atwood's pain. (Doc. 228 ¶ 26.) The telemedicine provider also prescribed topical Aspercream lidocaine patches for pain, which Defendant Olmstead agreed with because topical medications have less risk of drug interaction and side effects. (*Id.*)

On November 17, 2020, Mr. Atwood saw Defendant Olmstead to discuss his pain management and he told Olmstead he had severe low back pain, that the lidocaine patch provided temporary and localized pain relief, but he had trouble applying it properly to his lower back, he was allergic to Duloxetine, and requested "better, stronger" pain

medication. (*Id.* ¶¶ 27-28.)[6]  Mr. Atwood was offered to have someone on the nursing line apply the patch daily, but Mr. Atwood elected to continue applying the patch himself.  (*Id.* ¶ 31.)  The medical record for that visit notes that Mr. Atwood requested better, stronger pain medication and reported continued pain in his hands and continued severe pain in the lower back with radiculopathy, and that the pain was "shooting down the back of the [right] leg to the toes with intermittent numbness in the great toe, 2nd toe and sometimes 3rd toe." (Doc. 81-1 at 31.)  While Mr. Atwood did report the lidocaine patch provided some temporary relief of the low back pain, it did not help the radiculopathy.  (*Id*. at 31-32.)

Mr. Atwood continued to receive the daily lidocaine patch and Tylenol to manage his chronic pain, and Defendant Olmstead discussed her intent to obtain authorization for an MRI to determine if Mr. Atwood was a candidate for epidural steroid injections, but advised Mr. Atwood that chronic narcotics, including Tramadol, were not medically indicated due to his age, medical history, and absence of clinic findings to support the long-term use of opioids for arthritic pain.  (Doc. 228 ¶¶ 32-33.)

On January 8, 2021, Mr. Atwood had a cervical and lumber spine MRI, which Defendants assert showed degenerative changes with stenosis of varying degrees, and Olmstead discussed the results with Mr. Atwood on February 8, 2021.  (*Id.* ¶¶ 35-36.)  The cervical spine MRI Impression stated:

> 1.      Status post ACDF at C5-C6 with interbody osseous fusion.  Interbody osseous fusion is also seen at C4-C5.
>
> 2.      Multilevel degenerative changes of the cervical spine with associated spinal canal and neural foraminal stenosis as described in further detail above.
>
> 3.      Punctate focus of myelomalacia within the cord at C5-C6 level.

(Doc. 228-1 at 93.)

---

[6] Defendants cite to Doc. 18-1 in support of paragraphs 27 and 28, but the relevant records are found at Doc. 81-1.

The lumbar spine MRI Impression stated: "Multilevel degenerative changes of the lumbar spine with associated spinal canal stenosis, neural foraminal stenosis, and nerve root impingement as described in further detail above." (*Id.* at 95.)

Olmstead noted she would review the MRI findings with the Site Medical Director for a possible referral to the neurosurgeon and that Mr. Atwood may be a candidate for epidural steroid injections in the lumbar spine. (Doc. 228 ¶ 37.) Olmstead again told Mr. Atwood at the February 8, 2021 appointment that opioids were not medically indicated at that time based on his risk factors including age, fall risk, comorbidities, and the other medications he was being prescribed. (*Id.* ¶ 38.) Defendants assert that Mr. Atwood reported that the topical capsaicin cream and lidocaine patch helped his pain, but the patch had trouble sticking, so Olmstead gave Mr. Atwood a roll of medical tape to help keep the patch on. (*Id.* ¶ 39.) Although Olmstead noted in the medical record from that visit that Mr. Atwood said the capsaicin cream and lidocaine patch helped, he also reported worsening neck and low back pain. (Doc. 228-1 at 97, 106.) Olmstead noted that Mr. Atwood had a surgical history of cervical fusion "and continues to report unrelieved pain with current pain rx. Asking again for opio[i]ds today, specifically tramadol because SMD 'Dr. Stewart' approved it back in 2018". (*Id.*)

Plaintiff's expert, Dr. Davidson, reviewed Mr. Atwood's January 8, 2021 MRI of the lumber and cervical spine and concluded that Mr. Atwood had "severe cervical spondylosis with severe radicular symptoms to include, of great importance, C5-C6 myelomalacia. He has apparently overt radicular symptomatology as well as radiating pain, weakness, and motor dysfunction." (Doc. 109 at 28-29 ¶ 37.) Dr. Davidson concluded that Mr. Atwood's lumbar spine was his most painful condition, and "[his] neural symptomatology [] contributed to the weakness that [] limit[ed] his ability to transfer and position, let alone ambulate. In addition, the neural compression and degenerative spondylosis [we]re highly painful, most acutely when prone or in an erect seated posture." (*Id.* at 29 ¶ 38.) Even after Tramadol was discontinued, Dr. Davidson noted that Mr. Atwood had a history of falling, secondary to weakness in his legs, including falls in

November 2020 and March 2021 when he was not taking Tramadol.  (Doc. 109 at 24 ¶ 22.)  Mr. Atwood testified at the hearing that he had fallen a half dozen times since 2016, and he attributed his falls to his medical condition and not Tramadol because the falls occurred when he tried to move, and he would feel a twinge of pain and weakness and collapse.  (Doc. 167 at 115.)  Dr. Davidson testified that Mr. Atwood's falls were not necessarily attributable to Tramadol, and the falls indicated to him that Mr. Atwood needed more assistance with transfers and needed to be in a safer environment.  (*Id*. at 49.)

In January 2021, Mr. Atwood suffered an extreme case of diarrhea, which was eventually diagnosed as a staph infection; the infection intensified Mr. Atwood's back pain and caused spasms, and he was unable to leave his bed or roll onto his side for nearly a week.  (Doc. 109 at 25 ¶¶ 25-26.)  To accept meals and medication, Mr. Atwood crawled or slid across his cell's urine-covered and feces-smeared floor.  (*Id.* ¶ 25.)  Mr. Atwood received injections of Toradol and a corticosteroid injection, which provided some pain relief for a couple of weeks.  (*Id*. at 21 ¶ 15.)

On February 18, 2021, Defendant Olmstead told Mr. Atwood that the Site Medical Director did not find a neurosurgery consult to be medically necessary at that time, and Mr. Atwood was to continue conservative management for his lumbar stenosis and back pain.  (Doc. 228 ¶¶ 40-41.)

Mr. Atwood received Tramadol when he was hospitalized in April 2021for kidney issues and afterwards in the infirmary, but when he was moved back to the Browning Unit in June 2021, Defendant Olmstead reduced the dose of Tramadol to once daily with the intention of weaning Mr. Atwood off Tramadol completely.  (Doc. 109 at 26 ¶¶ 28-33.)

On April 6, 2021, Defendant Olmstead entered a consult request for a neurosurgeon "per request" of Dr. Young, the Regional Medical Director, and authorization was obtained on April 8, 2021.  (Doc. 228 ¶¶ 42-43.)  Mr. Atwood was scheduled for the next available appointment, and on June 25, 2021, he saw offsite neurosurgeon Dr. Feiz-Erfan, who recommended Mr. Atwood have an updated cervical MRI, which Mr. Atwood received on July 16, 2021.  (*Id.* ¶¶ 46-47.)

At an appointment with Dr. Feiz-Erfan on July 30, 2021, the neurosurgeon recommended an epidural steroid injection for Mr. Atwood's back pain, physical therapy, and a follow-up visit in three months.  (Doc. 228 ¶ 48.)  Dr. Feiz-Erfan noted a diagnosis of "status post anterior fusion, cervical 5-6, for myelopathy done by me on 12/11/2018.  New diagnosis is canal stenosis, lumbar 1-2, adjacent level disease, cervical spine."  (Doc. 132-1 at 17.)  Dr. Feiz-Erfan also recommended that Mr. Atwood go to the emergency room due to his acute symptoms, noting that Mr. Atwood reported a prior UTI treatment with antibiotics after lithotripsy for kidney stone and that Mr. Atwood was "significantly symptomatic and subjectively has shortness of breath," appeared pale and "appears sick acutely."[7]  (*Id.*)

Defendant Olmstead submitted authorization requests for a physical therapy consult and neurosurgery follow up in three months.  (Doc. 228 ¶ 49.)  Both requests for off-site care submitted on August 2 and August 3, 2021 were noted as "routine" priority.  (Doc. 132-1 at 33, 37.)  An appointment was scheduled for October 8, 2021, but because Mr. Atwood was sent to the Emergency Room on October 7, 2021 with a possible urinary tract infection, the appointment was rescheduled for the first available appointment, which was November 12, 2021.[8]  (Doc. 228 ¶¶ 50-51.)

When Mr. Atwood returned to prison from the hospital, he was admitted to the infirmary unit and received a short-course Tramadol prescription for his reported pain; on November 1, 2021, he was discharged from the infirmary and transferred back to the Browning Unit.  (Doc. 228 ¶¶ 52-53.)

Mr. Atwood's expert, Dr. Davidson, averred that from October 2020 to the time of his Declaration dated June 21, 2021, Mr. Atwood was prescribed a lidocaine patch and

---

[7] A subsequent medical record indicates that Mr. Atwood was admitted to the hospital for urosepsis, a left renal stone, and stent placement.  (Doc. 191-1 at 159-160.)

[8] Defendants do not say if the October 8, 2021 appointment was for physical therapy or to see Dr. Feiz-Erfan for follow up.  The records Defendants cite to are "Consultation Request Action" forms that state the requests are for "off-site clinic" and "Neuro Surgery." (*See* Doc. 228-1 at 131-34.)

Tylenol, which provided "no appreciable pain relief." (Doc. 109 at 23 ¶ 20.) At the October 29, 2021 hearing, Dr. Davidson recommended without reservation that Mr. Atwood again be prescribed Tramadol given that trials of other medications had not worked and because other narcotics that might help his pain could be more addictive and habit forming. (Doc. 167 at 60-61.)

On November 12, 2021, Mr. Atwood saw Dr. Feiz-Erfan, who noted he was referring Mr. Atwood to radiology for an epidural steroid injection, and Dr. Feiz-Erfan informed Mr. Atwood that all medical decisions, i.e., pain medication prescriptions was up to his primary care provider or a pain management specialist. (Doc. 228 ¶¶ 54-55.) Defendant Olmstead had expected Mr. Atwood to receive the steroid injection during his appointment with Dr. Feiz-Erfan, but she submitted a second consult request for the epidural steroid injection. (*Id.* ¶ 56.) The appointment for the steroid injection was eventually scheduled for December 14, 2021. (*Id.* ¶¶ 58-59.)

On December 7, 2021, the Court issued its Order granting Mr. Atwood preliminary injunctive relief and ordered Defendants to, within ten days, restart Mr. Atwood's prior prescription for Tramadol, unless a specialist had recommended an equally effective alternative pain medication, and the Court ordered Defendants to schedule the epidural injection(s) recommended by Dr. Feiz-Erfan unless the injection(s) had already occurred. (Doc. 173 at 19.)

On December 14, 2021, when Mr. Atwood arrived for the steroid injection appointment at Mountain Vista Medical Center (MVMC), he was told that the injection could not be completed due to his use of over-the-counter aspirin and ibuprofen, which are blood thinners. (Doc. 228 ¶ 60.) Mr. Atwood's medical providers were not aware of his purchase of the over-the-counter medications prior to his appointment, and the appointment was rescheduled for the first available on January 7, 2022. (*Id.* ¶¶ 61-62.)

On December 17, 2021, Defendant Olmstead restarted Mr. Atwood's Tramadol prescription for 50mg, twice daily. (*Id.* ¶ 64.) Mr. Atwood had to re-evaluated by a provider each week before the prescription could be renewed. (*Id.* ¶ 65.)

On December 27, 2021, Defendants filed a Notice of Compliance with the Preliminary Injunction, in which they notified the Court that they had restarted Mr. Atwood's Tramadol prescription on December 17, 2021, and that Mr. Atwood was taken for an epidural injection on December 14, 2021, but the injection could not be administered because Mr. Atwood had taken over-the-counter medications before the appointment and Defendants would reschedule the appointment.  (Doc. 178.)

On January 7, 2022, Mr. Atwood received a lumbar epidural injection at MVMC. (Doc. 228 ¶ 63.)

On January 17, 2022, Mr. Atwood reported "no improvement" in his low back pain after the epidural injection, and Olmstead renewed his Tramadol prescription and scheduled his next weekly follow-up for monitoring and compliance.  (*Id.* ¶¶ 66-67.)

Defendants' expert, Dr. Thomas Fowlkes, a board-certified emergency medicine doctor, reviewed Mr. Atwood's medical records "to determine the appropriateness of the medical care provided for his arthritis by Defendants while he was incarcerated after July 1, 2019," and "Dr. Fowlkes opines that the care provided to [Mr. Atwood] was reasonable, appropriate and within the acceptable standard of care.  (*Id.* ¶¶ 69-70.)  Dr. Fowlkes "recognized that [Mr. Atwood] had degenerative joint disease (arthritis) and that long-term opioids including tramadol in treatment of chronic, non-cancer pain are not the preferred treatment for chronic back pain."  (*Id.* ¶ 71.)  Dr. Fowlkes opined that "the exact nature, timing and extent of treatments for degenerative joint disease are often a judgment call, affected by input from both the patient and health care providers, and that the range of acceptable treatments and the timing of them is very broad depending on the specific circumstances, such as the degree of the patient's symptoms, impairment, activity level, and co-existing medical conditions."  (*Id.* ¶ 72.) Dr. Fowlkes reviewed Mr. Atwood's medical records and agreed there was no evidence Mr. Atwood was addicted to Tramadol, that Mr. Atwood was diverting or abusing Tramadol, or that his cognition suffered because of Tramadol.  (Doc. 167 at 80-85.)

Plaintiff's expert, Dr. Davidson, stated prior to the preliminary injunction hearing that in his professional opinion, "[a] prescribed moderate dose of Tramadol should be sustained" due to "its prior effectiveness and lack of side-effects over the span of many years," and "it is imperative and humane that additional, palliative measures also be implemented on this patient's behalf immediately.  These include lumbar and cervical orthosis, along with a residency setting where immediate hands-on wheelchair transferring assistance is continually available."  (Doc. 109 at 30 ¶¶ 41, 44.)

## V.   Eighth Amendment Legal Standard

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need." *Id.* (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)).  Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

1    Even if deliberate indifference is shown, to support an Eighth Amendment claim,

2    the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see*

3    *Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth

4    Amendment violation unless delay was harmful).

5    **VI.    Discussion**

6          **A.    Serious Medical Need**

7    Defendants make no argument with respect to this first prong of the Eighth

8    Amendment analysis. As it did in its previous Orders addressing Mr. Atwood's requests

9    for injunctive relief, the Court continues to find that Mr. Atwood's severe and chronic

10   spinal pain constituted a serious medical need that medical personnel found worthy of

11   attention and treatment. *See McGuckin*, 974 F.2d at 1059–60.

12   Because there is no dispute that Mr. Atwood suffered a serious medical need with

13   respect to his severe, chronic spinal pain, the Court's analysis turns on the subjective prong

14   and whether either Centurion or Olmstead was deliberately indifferent to this serious

15   medical need.

16         **B.    Deliberate Indifference**

17   There is no dispute that Defendants were aware of Mr. Atwood's diagnosed

18   condition and serious medical need because it is documented in his medical records

19   showing years of treatment for his spinal condition, including surgery, medication trials,

20   MRIs, physical therapy, and specialist appointments. Moreover, an orthopedic surgeon

21   recommended that Mr. Atwood have, at a minimum, palliative measures such as Tramadol

22   and epidural injections, and a neurosurgeon recommended epidural injection(s) and

23   physical therapy.

24   Defendants do dispute that they failed to adequately treat Mr. Atwood's serious

25   medical needs. They argue that Plaintiff has not shown that they purposefully failed to

26   respond to his medical needs or that the course of treatment he received was medically

27

28

1  unacceptable or in conscious disregard of an excessive risk to Mr. Atwood.[9]  (Doc. 230 at

2  13.)

3          With respect to the discontinuation of Mr. Atwood's Tramadol prescription,

4  Defendants argue that Plaintiff has failed to present any evidence that Mr. Atwood was

5  denied appropriate (not just his preferred) medical care or suffered from a serious medical

6  need at any time that was not addressed.  (Doc. 230 at 15.)  They argue that the medical

7  record shows that Defendants were consistently responsive to Mr. Atwood's medical

8  needs, that he received alternative, non-opioid pain medications for his back pain

9  complaints, including lidocaine pain patches and Tylenol, and he was evaluated and treated

10  multiple times by an offsite neurosurgeon, who never recommended he be prescribed

11  opioids.  (*Id.*)

12          **1.**     **Defendant Olmstead**

13          Defendants argue that after Defendant Olmstead made the decision to discontinue

14  Tramadol, she and other medical staff took steps to address Mr. Atwood's "arthritis," and

15  Mr. Atwood had imaging studies, saw the neurologist multiple times, and reported that the

16  alternative topical pain medications were helping his pain.  (Doc. 230 at 15.)  Defendants

17  further argue that the opinions of their expert, Dr. Fowlkes, "unquestionably show a

18  difference in medical opinion with respect to the effectiveness and appropriateness of the

19  medical treatment Mr. Atwood received for his arthritis, including a prescription for

20  opioids."  (*Id.* at 16.)

21          The Court did note in a January 12, 2021 Order denying injunctive relief, that

22  Defendant Olmstead was taking steps to address Mr. Atwood's pain by means other than

23  Tramadol, but the Court eventually granted injunctive relief in December 2021 because

24  Mr. Atwood's severe pain was not being adequately addressed.  (*See* Doc. 173.)

25

26

27        [9] Defendants first address Mr. Atwood's urinary issues/cystoscopy procedure and
Mr. Atwood's request for items recommended by a physical therapist, but Plaintiff has

28  clarified that she only intends to pursue the claim relating to the denial of Mr. Atwood's
Tramadol medication for his pain.  (*See* Doc. 233 at 2 n.1.)

The record reflects that after Defendant Olmstead discontinued Mr. Atwood's Tramadol in September of 2020, she prescribed Duloxetine, which was ineffective, and on October 27, 2020, Mr. Atwood was prescribed Tylenol and lidocaine patches.   On November 17, 2020, Mr. Atwood told Defendant Olmstead the patches provided some temporary pain relief but did not help his radiculopathy, and he described continued severe pain in the lower back with radiculopathy and pain shooting down his right leg to his toes and intermittent numbness.   In November 2020, Olmstead discussed with Mr. Atwood her intent to seek authorization for MRIs to determine if he was a candidate for epidural steroid injections, and on January 8, 2021, Mr. Atwood had the MRIs.   Also in January 2021, Mr. Atwood had an extreme case of diarrhea which exacerbated his back pain and caused spasms and he ended up crawling in his cell to receive meals and medication.   Mr. Atwood was hospitalized in April 2021 for kidney issues and he received Tramadol there and in the infirmary after his release, but Defendant Olmstead discontinued Mr. Atwood's Tramadol when he returned to the unit.

On April 6, 2021—three months after the MRIs showed "severe cervical spondylosis with severe radicular symptoms to include, of great importance, C5-C6 myelomalacia"—Defendant Olmstead submitted consultation requests for Mr. Atwood to see the neurosurgeon, and there is no explanation for the three-month delay.   It took nearly three more months for Mr. Atwood to see the neurosurgeon—on June 25, 2021—and by that time, the neurosurgeon wanted a new MRI.   After Mr. Atwood had another MRI, he saw the neurosurgeon again on July 30, 2021, and the neurosurgeon recommended epidural steroid injections, physical therapy and to follow up in three months.   But despite the significant time that had elapsed, Defendant Olmstead only submitted routine consultation requests for epidural lumbar injections and physical therapy.   Defendants say Mr. Atwood was scheduled for a neurosurgery appointment on October 8, 2021, but it is not clear if that was an appointment for an injection, and, at any rate, that appointment did not take place because Mr. Atwood was hospitalized for urinary tract issues, and he received a course of Tramadol before he returned to his unit on November 1, 2021.

On December 7, 2021, the Court issued its preliminary injunction Order for Mr. Atwood to receive Tramadol and steroid injections.  Mr. Atwood was supposed to receive a steroid injection on December 14, 2021, but that did not happen because Mr. Atwood had taken aspirin and ibuprofen, and Mr. Atwood finally received his first steroid injection on January 7, 2022.  Mr. Atwood's Tramadol prescription was restarted on December 17, 2021.

Given the long delay—nearly 15 months—from the discontinuation of Mr. Atwood's effective pain medication, Tramadol, and the resumption of Tramadol pursuant to a Court Order, a reasonable jury could conclude that Defendant Olmstead was deliberately indifferent to Mr. Atwood's serious medical needs.  Defendants have still provided no explanation for why Tramadol was appropriate for ten years and was suddenly inappropriate, or how the minimal pain relievers Mr. Atwood received outside of the hospital or infirmary were adequate to treat his significant pain issues.  While Defendant Olmstead asserted that the decision to discontinue Mr. Atwood's Tramadol was due to poor tolerance and side effects and no medical indication for continuing the medication, there are no medical records cited showing this poor tolerance or side effects caused by Tramadol or that Mr. Atwood exhibited poor tolerance/side effects to Tramadol, even during the occasions he was prescribed Tramadol in the hospital and infirmary, and he reported continued severe pain at nearly every medical encounter.  And while Olmstead has reported that Tramadol was discontinued because Mr. Atwood was a fall risk, there is no explanation for the falls Mr. Atwood suffered after Tramadol was discontinued.  Even Defendants' expert agreed was no evidence Mr. Atwood was addicted to Tramadol, that Mr. Atwood was diverting or abusing Tramadol, or that his cognition suffered because of Tramadol.

While Defendants argue that the evidence merely reflects a difference in medical opinion about the proper course of treating Mr. Atwood's severe pain, with Defendants' expert, Dr. Fowlkes, opining that the care provided to Mr. Atwood was reasonable, appropriate and within the acceptable standard of care, there is no evidence that Dr. Fowlkes ever treated Mr. Atwood or did anything more than review Mr. Atwood's medical

records.   In contrast, Plaintiff's expert, Dr. Davidson, evaluated Mr. Atwood and determined that pain interfered with nearly all Mr. Atwood's activities of daily living, and that without Tramadol, Mr. Atwood's pain was severe at 9 or 10 out of 10, but with Tramadol, Mr. Atwood's pain decreased to moderate and manageable pain level of 5 or 6. Dr. Davidson determined that without Tramadol, Mr. Atwood suffered "incomprehensible pain every time he need[ed] to transfer to bed, chair or wheelchair," and he only slept sporadically because he could not lie flat and had to sit in his wheelchair or partially recline in bed to minimize the severity of constant pain.   Given that Dr. Davidson evaluated Mr. Atwood and Dr. Fowlkes did not, this is more than a difference of opinion between treating physicians or even among experts.

In addition, Dr. Feiz-Erfan, Mr. Atwood's treating neurosurgeon, recommended epidural steroid injections and physical therapy in July 2021, but Mr. Atwood did not receive his first injection until January 2022.  While Mr. Atwood's hospitalization partially explains the delay, the fact that it took over five months for the first injection suggests there was no urgency in treating Mr. Atwood despite evidence that he was in significant pain.

Defendants also argue that Plaintiff has not shown that Mr. Atwood suffered any actual injury as a result of any alleged deliberate indifference by Defendants.  (Doc. 230 at 16.)  They argue that there is no objective evidence demonstrating an increase in pain after Tramadol was discontinued, that Mr. Atwood reported that the lidocaine patches and non-narcotic pain medication prescriptions were providing pain relief, and that the physical therapy and epidural steroid injection recommended by Dr. Feiz-Erfan did not help his pain.

To the contrary, the evidence reflects that Mr. Atwood reported significantly increased pain after Tramadol was discontinued, that the lidocaine patches only provided temporary relief and did nothing for his neuropathy, that he continued to have falls, and suffered excruciating pain.  Mr. Atwood himself testified about the increased pain he suffered after Tramadol was discontinued and that other pain relievers were largely ineffective.  This evidence supports that the delay in effectively treating Mr. Atwood's

severe pain was harmful.  *See Jett*, 439 F.3d at 1096 ("[a] prisoner need not show his harm was substantial" under the subjective standard); *see also Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose").  At a minimum, there is a question of fact whether Mr. Atwood suffered an actual injury as result of Defendants' actions.

Given that Defendant Olmstead was Mr. Atwood's primary treating provider, and it took nearly 15 months for Mr. Atwood to begin receiving adequate pain relief under her care, there is a question of fact whether Defendant Olmstead was deliberately indifferent to Mr. Atwood's serious medical pain issues, and the Court will deny summary judgment to Defendant Olmstead.

### 2.    Defendant Centurion

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity.  *See Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 691 (1978), to private entities acting under color of law).  Under *Monell*, a plaintiff must show that (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs*., 237 F.3d 1101, 1110–11 (9th Cir. 2001).

The Court has already determined there are material factual disputes as to whether Mr. Atwood suffered a constitutional injury as a result of his Tramadol being discontinued for fifteen months.  The Court therefore proceeds to the second *Monell* element—whether Centurion had a policy or custom.

A policy is "a deliberate choice to follow a course of action" made by the officials or entity "responsible for establishing final policy with respect to the subject matter in question." *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992).  A policy can be one of action or inaction.  *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).  A "custom" for purposes of municipal liability is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  While one or two incidents are insufficient to establish a custom or practice, the Ninth Circuit has not established what number of similar incidents would be sufficient to constitute a custom or policy.  *See Oyenik v. Corizon Health Inc.*, No. 15-16850, 2017 WL 2628901, at *2 (9th Cir. June 19, 2017) (a reasonable jury could conclude that at least a dozen instances of defendant Corizon denying or delaying consultations and radiation treatment for cancer patient over a year amounts to a custom or practice of deliberate indifference) (citing *Oviatt*, 954 F.2d at 1478).  But "[t]here is no case law indicating that a custom cannot be inferred from a pattern of behavior toward a single individual." *Id.*  Whether actions by entity officers or employees amount to a custom "depends on such factors as how longstanding the practice is, the number and percentage of officials engaged in the practice, and the gravity of the conduct." *Mi Pueblo San Jose, Inc. v. City of Oakland*, No. C-06-4094 VRW, 2006 WL 2850016, at *4 (N.D. Cal. Oct. 4, 2006).

Defendants argue that Plaintiff has not supported Mr. Atwood's allegation that Centurion's usual procedure for outside medical consultation and treatment involved months of delays or that Centurion had a policy of not providing "heavy opiates" to prisoners in his unit that was not based on medical criteria.  (Doc. 230 at 18.)  Defendants argue the record is full of instances of Mr. Atwood receiving timely medical care from

1  Centurion providers with respect to his numerous health issues.  Defendants further assert

2  that Centurion has an unwritten policy "based on medical criteria and implemented by Dr.

3  Rodney Stewart" that opioids are not generally prescribed for an extended or indefinite

4  period of time unless the patient is suffering cancer-related illness or pain, terminal illness

5  with pain, and other serious long-term disease implicating severe pain symptoms." (*Id*.)

6  　　　　As to Defendants' argument that they provided some care to Mr. Atwood, even if

7  some treatment is provided, a failure to competently treat a serious medical condition may

8  constitute deliberate indifference in a particular case.  *Ortiz v. City of Imperial*, 884 F.2d

9  1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is

10 competent and can render competent care"); *see Lopez v. Smith*, 203 F.3d 1122, 1132 (9th

11 Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

12 　　　　A reasonable jury could find that Centurion's policy was deliberately indifferent

13 because it does not account for patients such as Mr. Atwood who was successfully treated

14 with Tramadol for over ten years for his serious pain issues, his Tramadol was abruptly

15 discontinued for fifteen months without an adequate substitute, and Mr. Atwood suffered

16 severe pain, falls and difficulty performing his ADLs without Tramadol or an adequate

17 substitute.

18 　　　　To establish that a policy or custom is the "moving force" behind a constitutional

19 violation, a plaintiff must demonstrate a direct causal link between the policy or custom

20 and the constitutional deprivation.  *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v.*

21 *Brown*, 520 U.S. 397, 404 (1997).  Defendants appear to argue that Mr. Atwood did not

22 come within the unwritten policy's guidelines for opioid treatment of his severe pain.  An

23 obvious consequence of Mr. Atwood not coming under this policy was the denial and delay

24 of constitutionally adequate pain relief.  On this basis alone, the moving-force element is

25 satisfied.  *See Brown*, 520 U.S. at 405 ("the conclusion that the action taken or directed by

26 the [entity] . . . itself violates federal law will also determine that the [entity] action was

27 the moving force behind the injury of which the plaintiff complains").

28 　　　　Accordingly, there exists a question of fact as to whether Defendant Centurion had

1    a deliberately indifferent policy that deprived Mr. Atwood of his constitutional rights, and

2    the Court will deny summary judgment to Defendant Centurion.

3        **C.**      **Damages**

4           **1.**      **Pre-Death Pain and Suffering**

5       Defendants argue that although Arizona's survival statute authorizes a survival

6    action, it precludes recovery for damages for pain and suffering of Mr. Atwood.  (Doc. 230

7    at 19, citing Ariz. Rev. Stat. § 14-3110.)

8       "The policies underlying § 1983 include compensation of persons injured by

9    deprivation of federal rights and prevention of abuses of power by those acting under color

10   of state law."  *Robertson v. Wegmann*, 436 U.S. 584, 591-92 (1978).  Section 1983 does

11   "not address directly the question of damages."  *Carey v. Piphus*, 435 U.S. 247, 255 (1978).

12   Therefore, courts must apply "state-law survival remedies in § 1983 actions unless those

13   remedies are 'inconsistent with the Constitution and laws of the United States.'"  *Jefferson*

14   *v. City of Tarrant, Ala*., 522 U.S. 75, 79 (1997) (quoting *Robertson*, 436 U.S. at 588-90).

15       Arizona's survival statute provides that "every cause of action," with the exception

16   of certain causes of action not relevant here, "shall survive the death of the person entitled

17   thereto or liable therefor, and may be asserted by or against the personal representative of

18   such person, provided that upon the death of the person injured, damages for pain and

19   suffering of such injured person shall not be allowed."  Ariz. Rev. Stat. § 14-3110.  Whether

20   a state-law limitation on damages, such as in Arizona's survival statute, applies in § 1983

21   actions depends on whether the limitation is inconsistent with the goals in § 1983 of

22   compensation and deterrence.  *Robertson*, 436 U.S. at 591.

23       As this Court has previously found, "[t]here is no controlling authority resolving the

24   question of whether Arizona's limitation on the recovery of survival damages—namely,

25   the exclusion of damages for pre-death pain and suffering when a decedent's death is not

26   caused by a defendant's purported excessive force—is inconsistent with Section 1983."

27   *Erickson v. Camarillo*, No. CV-14-01942-PHX-JAT, 2017 WL 2335659, at *2 (D. Ariz.

28

May 30, 2017) (citing *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014).

In *Erickson*, this Court rejected the defendant's proposed jury instruction that pain and suffering damages were available only if the jury found that the defendant officer's use of force caused the decedent's death because such an instruction would undermine § 1983's goal of compensation and deterrence because it would, inter alia, create a potential "windfall to the individual accused of engaging in unlawful conduct" should the victim die. 2017 WL 235659, at *6-7.

Neither party has directed the Court to more recent, controlling authority resolving this question and the Court in unaware of such authority.  A more recent decision in this district also permitted a plaintiff to recover pain-and-suffering damages arising from alleged violations of federal law that did not cause the decedent's death despite the preclusion of such damages under Arizona's survival statute.  *See Andrich v. Kostas*, 470 F.Supp.3d 1048, 1057 (D. Ariz. 2020) ("Applying A.R.S. § 14-3110 to preclude recovery for the fist strikes and taser use that preceded Mr. Andrich's death would be inconsistent with the goals underlying 42 U.S.C. § 1983.")  This Court therefore continues to believe that, in this case, Arizona's survival statute is inconsistent with § 1983's goals of compensation and deterrence, and Plaintiff is not precluded from seeking damages for Mr. Atwood's pre-death pain and suffering.

### 2.   Punitive Damages

Defendants argue that Plaintiff's request for punitive damages is not warranted because punitive damages are intended to punish a defendant whose "conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federal protected rights of others." (Doc. 230 at 19, quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983).)  Defendants argue that Plaintiff has failed to offer any evidence that any Defendant engaged in conduct that approaches the evil mind or reckless disregard standard. (*Id*. at 19-20.)

Whether punitive damages are warranted is an issue reserved for the jury.  *See Smith*, 461 U.S. at 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").  A jury may assess punitive damages in a § 1983 action when the defendant's conduct "is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Id.* at 56.  Here, a reasonable jury could conclude that Defendants exhibited reckless or callous indifference to Mr. Atwood's right to adequate medical care, and Defendants request to dismiss the punitive damages claim will be denied.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 230).

(2)     Defendants' Motion for Summary Judgment (Doc. 230) is **denied**.

(3)     This action is referred to Magistrate Judge Ambri to conduct a settlement conference.  The Parties must jointly call Magistrate Judge Ambri's chambers at (520) 205-4500 within 14 days to schedule a date for the settlement conference.

Dated this 26th day of February, 2024.

James A. Teilborg
Senior United States District Judge